**UMIA**

310 East 4500 South, Suite 600

Salt Lake City, Utah

84107

t. 801.531.0375

f. 801.531.0381

www.umia.com

December 4, 2020

This is a true and exact copy of the original policy.

Name: Enrico F. Arguelles MD
Policy: MT030713
Policy Dates: 01/01/2017 to 01/01/2018

State of

_____

County of

_____

I certify that this is a true and correct copy of a document in the possession of

_____

Dated:

_____

_____

(Signature of notarial officer)

_____

Title (and Rank)

My commission expires:

_____



**UMIA**
UMIA Insurance, Inc.

310 East 4500 South, Suite 600
Salt Lake City, Utah 84107
t. 801.531.0375
f. 801.531.0381
www.umia.com

## DECLARATIONS

Issued by: UMIA Insurance, Inc.

Policyholder Name and Address:

Enrico F. Arguelles, MD
708 Broadwater Avenue
Billings, MT 59101

Policy Number:     MT030713

Policy Period: 01/01/2017 to 01/01/2018    *12:01 a.m. standard time at the address of the Policyholder.*

## MEDICAL PROFESSIONAL LIABILITY INSURANCE - CLAIMS-MADE

| Coverage | Limits of Liability | Deductible |
|---|---|---|
| Each Medical Incident Limit | $1,000,000 | $0 |
| Individual Insured Aggregate Limit | $3,000,000 | $0 |
| Insured Entity Aggregate Limit | NA | $0 |
| Aggregate Deductible | NA | $0 |

| Additional Benefits | Limit | Deductible |
|---|---|---|
| Licensure Proceeding - Each Complaint | $25,000 | $0 |
| Licensure Proceeding - Aggregate | $25,000 | $0 |
| Insured Expenses - Each Day | $1,000 | $0 |
| Each Patient Medical Expense Limit | $10,000 | $0 |
| Aggregate Medical Expense Limit | $10,000 | $0 |

| **Total Policy Premium** | | $6,874 |
|---|---|---|

Forms and endorsements forming part of this policy:

| Form Name | Form Number | Edition Date |
|---|---|---|
| Declarations | DEC | 09/2017 |
| Schedule of Insureds | SCHED | 09/2017 |
| Medical Professional Liability Insurance - Claims-Made | MPLC | 09/2017 |
| Cyber Solutions®/Medefense® Plus Endorsement - Montana | CSMPMT | 09/2017 |
| Separate Defense Cost Limits for Cyber Solutions®/Medefense ®Plus - Montana | CMSDCMT | 09/2017 |
| Non-Stacking Limits Endorsement | CNSL | 09/2017 |
| Patient Medical Expense - Claims-Made - Montana | PMECCMT | 09/2017 |
| State Amendatory Endorsement | MTAM | 09/2017 |
| Common Conditions | COMCON | 09/2017 |

_Julie Stafford_

_____

Julie Stafford - President

Issue Date:    11/03/2016



**UMIA Insurance, Inc.**

310 East 4500 South, Suite 600
Salt Lake City, Utah 84107
t. 801.531.0375
f. 801.531.0381
www.umia.com

## SCHEDULE

Issued by: UMIA Insurance, Inc.

Policy Number: MT030713

Effective Date: 01/01/2017
Issue Date: 11/03/2016

| Insured Entity | Prior Acts Date | Specialty Class Code | Limits of Liability | Premium |
|---|---|---|---|---|
| NA | NA | NA | NA | NA |

| Individual Insured | Prior Acts Date | Specialty Class Code | Limits of Liability | Premium |
|---|---|---|---|---|
| Enrico F. Arguelles, MD | 09/01/1990 | Rheumatology-No Surgery | $1,000,000/$3,000,000 | $6,874 |

Authorized Representative:

Julie Stafford
President
UMIA Insurance, Inc.

SCHEDULE



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4380, f. 801.531.0381
UMIA.com

**Medical Professional Liability Insurance Claims-Made and Reported**

## TABLE OF CONTENTS

SECTION ONE – INSURING AGREEMENT ...................................................................... 1
SECTION TWO – DETERMINING WHEN A CLAIM IS FIRST MADE AND REPORTED ................. 1
SECTION THREE – EXCLUSIONS ..................................................................................... 1
A.      Billing ........................................................................................................................ 1
B.      Contract ..................................................................................................................... 1
C.      Criminal or Knowingly Wrongful Acts ........................................................................ 1
D.      Employees ................................................................................................................. 1
E.      Employment Practices ............................................................................................... 1
F.      Prior Known Incidents ................................................................................................ 2
G.      Unfair Competition And Restraint Of Trade .............................................................. 2
H.      Violation Of Law ........................................................................................................ 2

SECTION FOUR – DEFINITIONS ...................................................................................... 2
A.      Claim .......................................................................................................................... 2
B.      Damages .................................................................................................................... 2
C.      Extended Reporting Period ........................................................................................ 2
D.      Individual Insured ...................................................................................................... 2
E.      Insured ....................................................................................................................... 2
F.      Insured Entity ............................................................................................................. 2
G.      Leased Health Care Provider .................................................................................... 2
H.      Legal Expenses ......................................................................................................... 2
I.      Locum Tenens ........................................................................................................... 2
J.      Medical Incident ......................................................................................................... 2
K.      Peer Review Service .................................................................................................. 2
L.      Policyholder ............................................................................................................... 2
M.      Policy Period .............................................................................................................. 2
N.      Prior Acts Date ........................................................................................................... 2
O.      Professional Services ................................................................................................ 3
P.      Related Medical Incidents ......................................................................................... 3

SECTION FIVE – INSUREDS ............................................................................................ 3
SECTION SIX – LIMITS OF LIABILITY ............................................................................. 3
SECTION SEVEN – DEDUCTIBLE ................................................................................... 3
SECTION EIGHT – ADDITIONAL BENEFITS ................................................................... 4
A.      Licensure Proceedings .............................................................................................. 4
B.      Insured Expenses ...................................................................................................... 4

SECTION NINE – EXTENDED REPORTING PERIOD ...................................................... 4
A.      Effect of an Extended Reporting Period .................................................................... 4
B.      Automatic Limited Extended Reporting Period .......................................................... 4
C.      Optional Extended Reporting Period ......................................................................... 4
D.      Waiver of Extended Reporting Period Premium ........................................................ 5
E.      Limits of Liability and Deductible ............................................................................... 5

SECTION TEN – CONDITIONS ......................................................................................... 5
A.      Consent to Settle ....................................................................................................... 5
B.      Territory ...................................................................................................................... 5
C.      Notice of a Claim ....................................................................................................... 5
D.      Notice of a Medical Incident ...................................................................................... 6
E.      Other Insurance or Risk Transfer Agreements ......................................................... 6

## MEDICAL PROFESSIONAL LIABILITY INSURANCE CLAIMS-MADE AND REPORTED

This insurance applies to *claims* that are first made and reported during the *policy period* or any applicable *extended reporting period*.

### SECTION ONE - INSURING AGREEMENT

A.    We will pay *damages* an *insured* is legally required to pay as a result of a *medical incident* that happens on or after the applicable *prior acts date* and before the expiration date of this insurance. To fall within this insuring agreement the *claim* must be first made against the *insured* and reported to us during the *policy period* or any applicable *extended reporting period*.

B.    We will pay *legal expenses* we incur in the investigation or defense of a *claim* covered by this insurance.

C.    We have the right to control the defense of and retain an attorney to defend any *claim* covered by this insurance. We have the right to settle any *claim* subject only to the *policyholder's* right to consent as described in SECTION TEN - CONDITIONS.

D.    We have no obligation to pay *damages* or *legal expenses* after the applicable limit of liability found in the Declarations has been paid.

### SECTION TWO - DETERMINING WHEN A CLAIM IS FIRST MADE AND REPORTED

A.    A *claim* will be considered to have been first made on the date any *insured* receives notice of a *claim*.

B.    A *claim* will be considered to have been first reported on the earlier of:

    1.    The date we receive written notice of a *claim*, or
    2.    The date we receive notice of a *medical incident* as described in SECTION TEN – CONDITIONS.

C.    All *claims* arising out of the same *medical incident* and *related medical incidents* will be considered to have been first made and reported when the first *claim* arising out of the *medical incident* or *related medical incidents* was made and reported.

### SECTION THREE - EXCLUSIONS

A.    BILLING

    This insurance does not apply to any *claim* arising out of any *insured's* billing practices.

B.    CONTRACT

    This insurance does not apply to any *claim* arising out of:

    1.    The failure of any *insured* to perform any contract; or
    2.    Any liability in which an *insured* agreed, under an oral or written contract or agreement, to indemnify any party.

    This exclusion does not apply to any liability the *insured* would have absent the oral or written contract or agreement.

C.    CRIMINAL OR KNOWINGLY WRONGFUL ACTS

    This insurance does not apply to any *claim* arising out of a criminal, willful, malicious, fraudulent, dishonest or knowingly wrongful act committed by or with the knowledge of the *insured*.

D.    EMPLOYEES

    This insurance does not apply to any *claim* brought by a current or former employee of any *insured*. This exclusion does not apply to injury sustained by a patient who is a current or former employee resulting from medical care or treatment. This exclusion does not apply to any *claim* arising out of a *peer review service*.

E.    EMPLOYMENT PRACTICES

    This insurance does not apply to any *claim* arising out of an employment-related practice, policy, act or omission, including the hiring, termination, demotion, evaluation, discipline, defamation, harassment, humiliation or discrimination of a prospective, current or former employee of any *insured*. This exclusion does not apply to any *claim* arising out of a *peer review service*.

F.    PRIOR KNOWN INCIDENTS

This insurance does not apply to any *claim* arising out of:

1.    A *medical incident* any *insured* knew or reasonably should have known about prior to the effective date of this insurance that was likely to result in a *claim*, or

2.    Any *claim* covered by a policy in effect prior to the effective date of this insurance.

G.    UNFAIR COMPETITION AND RESTRAINT OF TRADE

This insurance does not apply to any *claim* arising out of unfair competition, restraint of trade or other business dispute.

H.    VIOLATION OF LAW

This insurance does not apply to any *claim* arising out of the violation of any local, state or federal statute, rule or regulation.

## SECTION FOUR - DEFINITIONS

A.    *Claim* means a demand for money or services resulting from a *medical incident*.

B.    *Damages* means amounts that an *insured* is legally obligated to pay to compensate another for injury or damage resulting from a *medical incident*.

C.    *Extended reporting period* means the additional time provided after the expiration of the *policy period* for reporting *claims* resulting from a *medical incident* that happened on or after the applicable *prior acts date* and before the end of the *policy period*.

D.    *Individual insured* means a person identified in a schedule or endorsement to this insurance as an *individual insured*.

E.    *Insured* means any entity or individual qualifying as an *insured* under SECTION FIVE – INSUREDS.

F.    *Insured entity* means an organization, corporation, partnership, professional association or limited liability company identified in a schedule or endorsement to this insurance as an *insured entity*.

G.    *Leased health care provider* means an individual working for the *policyholder* or an *insured entity* pursuant to a contract or agreement with a staffing agency or other entity.

H.    *Legal expenses* means:

1.    Fees charged by an attorney retained by us to investigate or defend a *claim* covered by this insurance

2.    Fees and expenses incurred by us in the investigation, adjustment, defense and appeal of a *claim* covered by this insurance

3.    Premiums for any appeal bond, attachment bond or similar bond for the amount of a judgment within the applicable limit of liability

4.    All costs, other than attorneys' fees, taxed against an *insured* as a result of a *claim* covered by this insurance

5.    The interest on the amount of covered *damages* that is within our limit of liability that accrues after entry of the judgment and before we have paid or offered to pay the covered *damages* which do not exceed the applicable limit of liability

6.    Prejudgment interest awarded against an *insured* on the portion of a judgment we pay

*Legal expenses* do not include salary or wages paid to our employees or the employees of an *insured*.

I.    *Locum tenens* means a health care provider who is temporarily serving as a substitute for an *individual insured* under a written contract or agreement.

J.    *Medical incident* means an adverse or unanticipated outcome resulting from *professional services* that were, or should have been, provided by an *insured* or by a person for whom the *insured* is liable.

K.    *Peer review service* means evaluating the professional qualifications of another under the auspices of a formal review board or committee.

L.    *Policyholder* means the individual or entity identified as the *policyholder* in the Declarations.

M.    *Policy period* means the time beginning on the effective date of the policy and ending on the expiration date found in the Declarations, the date the policy is cancelled, or the coverage termination date of any *insured*, whichever is earlier.

N.    *Prior acts date* means the date listed as such in a schedule or endorsement.

O.    *Professional services* means medical care or treatment provided to a patient, a medical opinion rendered by an *insured*, decisions made that require the specialized skill, training or judgment of a health care professional, or *peer review service*.

P.    *Related medical incidents* means all *medical incidents* arising out of the same or similar circumstances or medical treatment.

## SECTION FIVE - INSUREDS

A.    The following individuals and entities qualify as *insureds* under this insurance:

    1.    The *policyholder*, if identified as an *insured* in a schedule or endorsement
    2.    An *insured entity*
    3.    An *individual insured*
    4.    An *insured's* employees or volunteers for liability resulting from *professional services* while acting within the scope of their duties for an *insured entity* or *individual insured*
    5.    A *locum tenens*, if an *insured entity* or *individual insured* agreed in a written contract or agreement to provide professional liability insurance for the *locum tenens*

B.    The following are not *insureds* under this insurance unless identified in a schedule or endorsement to this insurance as an *individual insured*: nurse anesthetists, nurse midwives, heart-lung perfusionists, podiatrists, *leased health care providers*, interns, externs, residents and dental, osteopathic, chiropractic or medical doctors.

## SECTION SIX - LIMITS OF LIABILITY

A.    The Each Medical Incident Limit of Liability is the most we will pay as *damages* covered by this insurance on behalf of:

    1.    An *individual insured*, and all employees and volunteers of the *individual insured*, for all *claims* arising out of injury to any one person as a result of a *medical incident* or *related medical incidents*, or
    2.    An *insured entity*, and all employees and volunteers of the *insured entity*, for all *claims* arising out of injury to any one person as a result of a *medical incident* or *related medical incidents*.

   The limit of liability applies regardless of the number of claimants seeking *damages* arising out of injury to any one person.

B.    The Individual Insured Aggregate Limit of Liability is the most we will pay as *damages* covered by this insurance on behalf of any one *individual insured* and the employees and volunteers of that *individual insured* for all *claims* as a result of all *medical incidents*.

C.    The Insured Entity Aggregate Limit of Liability is the most we will pay as *damages* covered by this insurance on behalf of an *insured entity* and all employees and volunteers of that *insured entity* for all *claims* as a result of all *medical incidents*.

D.    *Individual insureds* share the applicable limit of liability with their employees and volunteers. An *insured entity* shares the applicable limit of liability with their employees and volunteers.

E.    *Individual insureds* and *insured entities* do not share any limits of liability with each other under this insurance. If an employee or volunteer also qualifies as an *individual insured*, the most we will pay as *damages* on behalf of that employee or volunteer is the limit afforded to an *individual insured*.

F.    The limit of liability includes the applicable deductible.

G.    An individual who qualifies as an *insured* under this insurance as a *locum tenens* will share the applicable limit of liability with the *individual insured* they are replacing.

H.    *Legal Expenses* are paid in addition to the limits of liability in this section.

## SECTION SEVEN - DEDUCTIBLE

A.    The Each Medical Incident Deductible is the amount the *policyholder* must pay as *damages* for injury to any one person as a result of a *medical incident* or *related medical incidents*.

B.    The Aggregate Deductible is the amount the *policyholder* must pay as *damages* arising out of all *medical incidents*.

C.   Subject to the *policyholder's* right to consent, we may, at our discretion, pay *damages* within the deductible amount to effect settlement of any *claim* or to satisfy a judgment against an *insured*. In the event that we make a payment within the deductible amount, the *policyholder* agrees to reimburse us for the full amount of the payment that was made, within 30 days of receiving our request for reimbursement.

D.   The deductible does not apply to the Additional Benefits.

## SECTION EIGHT - ADDITIONAL BENEFITS

A.   LICENSURE PROCEEDINGS

We will pay fees charged by an attorney, retained by us, to represent an *individual insured*, or an *insured's* employee, to respond to a formal complaint from a governmental body responsible for the licensure of health care professionals. The complaint must be first made against the *insured* and reported to us in writing during the *policy period*.

1.   The Each Complaint Limit is the most we will pay as fees incurred in responding to one complaint against an *insured*
2.   The Aggregate Limit is the most we will pay as fees incurred in responding to all complaints against an *insured*

B.   INSURED EXPENSES

We will pay reasonable expenses, including lost income, that an *insured* incurs in complying with our specific request to attend a deposition or appear at a trial or similar formal proceeding.

The Each Day Limit is the most we will pay for expenses incurred by an *insured* on any one day.

## SECTION NINE - EXTENDED REPORTING PERIOD

A.   EFFECT OF AN EXTENDED REPORTING PERIOD

An *extended reporting period* does not alter or extend the *policy period* but does extend the period for reporting a *claim* that would have been covered by this insurance if the *claim* had been first made against the *insured* and reported to us prior to the coverage termination date. An *extended reporting period* does not apply to a *claim* that is covered by a policy that goes into effect after the termination date of this insurance.

B.   AUTOMATIC LIMITED EXTENDED REPORTING PERIOD

When this policy is terminated or expires, we will provide an automatic *extended reporting period* at no charge. This limited *extended reporting period* starts on the date of termination of the policy and may continue for up to 30 consecutive days. This automatic *extended reporting period* ends on the date the *insured* obtains another policy of professional liability insurance or 30 days after the termination date, whichever is earlier. *Claims* reported during the automatic limited *extended reporting period* are subject to the limit of liability and deductible that apply under the terminated insurance. The automatic limited *extended reporting period* does not apply if this insurance is cancelled for non-payment of premium, or we issue an optional *extended reporting period*.

C.   OPTIONAL EXTENDED REPORTING PERIOD

If this insurance is non-renewed or cancelled for any reason other than non-payment of premium, the *policyholder* has the right to purchase an *extended reporting period* that would apply to all *insureds*. If the coverage provided by this insurance ends for any *individual insured*, the *individual insured* has the right to purchase an *extended reporting period*.

This *extended reporting period* will be provided by an endorsement we issue for an additional premium. The right to purchase an *extended reporting period* must be exercised within 30 days of the termination of coverage by providing:

1.   Written notice to us, and
2.   Payment of the premium when due.

The premium for the *extended reporting period* will be considered fully earned on the effective date of the *extended reporting period*. We will determine the duration of, and the premium for, the *extended reporting period* in accordance with the rules and rates in place on the effective date of the *extended reporting period*. The premium for the *extended reporting period* must be paid within 30 days of the date the coverage is terminated. If the premium is paid in full, the *extended reporting period* cannot be cancelled.

D.    WAIVER OF EXTENDED REPORTING PERIOD PREMIUM

The written request for a premium waiver for an *extended reporting period* must be received by us within 30 days of the date the *individual insured's* coverage terminates.

1.    DEATH

If an *individual insured* dies during the *policy period*, we will issue an *extended reporting period* for no additional premium.

2.    DISABILITY

If an *individual insured* becomes totally and permanently disabled during the *policy period*, we will issue an *extended reporting period* for no additional premium if the *individual insured* provides a written report of an independent medical examination and any other records or documents establishing that, as a result of mental illness, physical injury or disease, the *individual insured* has been incapable of performing the material and substantial functions of their profession for a period of not less than six months and the disability is permanent.

3.    AGE AND YEARS INSURED

If an *individual insured* chooses during the *policy period* to terminate coverage, we will issue an *extended reporting period* to that *individual insured* for no additional premium if one of the following applies:

(a).    The *individual insured* has been continuously insured by us for a minimum of 15 years and is at least 60 years old, or

(b).    The *individual insured* has been continuously insured by us for a minimum of 10 years and is at least 62 years old.

4.    RETIREMENT

If an *individual insured* chooses during the *policy period* to retire permanently from the practice of medicine and terminate coverage we will issue an *extended reporting period* to that *individual insured,* for no additional premium, if the *individual insured* has been continuously insured by us for a minimum of one year.

E.    LIMITS OF LIABILITY AND DEDUCTIBLE

The limits of liability and the applicable deductible that apply to a *claim* reported during an *extended reporting period* will be described in the *extended reporting period* endorsement.

## SECTION TEN - CONDITIONS

The Common Conditions apply to this insurance. In addition, the following apply:

A.    CONSENT TO SETTLE

We will not settle a *claim* brought against an *insured* without the prior written consent of the *policyholder*. The *policyholder* agrees that consent will not be unreasonably withheld. The *policyholder* agrees that it would be unreasonable to withhold consent if:

1.    The *insured* is not available to assist in the defense, or
2.    A verdict or judgment has been entered against the *insured*.

B.    TERRITORY

This insurance applies to *medical incidents* occurring anywhere in the world. However, no coverage is provided for, and we will not defend any *claim* brought against an *insured* outside of the United States of America, its territories or possessions.

C.    NOTICE OF A CLAIM

The *insured* must promptly provide written notice to us of a *claim* first made during the *policy period*, but in no event later than the time provided by an applicable *extended reporting period*. The notice must include the time, place and nature of the *medical incident* and identify any injured persons.

D.    NOTICE OF A MEDICAL INCIDENT

The *insured* must provide written notice to us of all *medical incidents*, including a request for medical records.

The notice provided of a *medical incident* must describe the adverse or unanticipated outcome and must include the time, place, medical treatment provided and identify any injured persons. We will issue a written acknowledgment of the notice of a *medical incident*. Any *claim* resulting from the *medical incident* will be treated as if it had been first made against the *insured* and reported to us under the policy in effect at the time of the notice.

E.    OTHER INSURANCE OR RISK TRANSFER AGREEMENTS

If any other insurance, including risk transfer agreement, self-insurance, indemnification agreement, trust agreement or patient compensation fund, provides coverage to an *insured* for *damages* covered by this insurance, the insurance we provide will be excess and we will not make any payment of *damages* or *legal expenses* unless and until the limits of liability of any other insurance have been exhausted.

It is the intent of this provision to ensure that the coverage afforded by this insurance is excess to any other insurance whether designated to be primary, excess, contingent or on any other basis. We will pay our share of any *damages* that exceed the *damages* covered by all other insurance. This provision does not apply to excess insurance purchased by the *insured* that lists this policy as scheduled underlying insurance.


_____
Authorized Representative

_____
Authorized Representative



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3992
p. 800.748.4380, f. 801.531.0381
UMIA.com

**Cyber Solutions®/Medefense® Plus Endorsement**
**(Claims-Made and Reported Coverage)**

*DEFENSE COSTS* PAID UNDER THIS ENDORSEMENT WILL ERODE THE LIMITS OF LIABILITY

CYBER SOLUTIONS®/MEDEFENSE® PLUS SCHEDULE OF LIMITS

1.  **Cyber Solutions Limits**
    (each *insured entity* and *insured healthcare professional*):

| | | |
|---|---|---|
| A. | Multimedia Liability | $100,000 each *claim*/aggregate |
| B. | Security and Privacy Liability | $100,000 each *claim*/aggregate |
| C. | Privacy Regulatory Defense and Penalties | $100,000 each *claim*/aggregate |
| D. | PCI DSS Assessment | $100,000 each *claim*/aggregate |
| E. | Privacy Breach Response Costs, Patient Notification Expenses, and Patient Support and Credit Monitoring Costs | $100,000 each *claim*/aggregate |
| | Proactive Privacy Breach Response Costs Sublimit | $100,000 each *claim*/aggregate |
| | Voluntary Notification Expenses Sublimit | $100,000 each *claim*/aggregate |
| F. | Network Asset Protection | $100,000 each *claim*/aggregate |
| G. | Cyber Extortion | $100,000 each *claim*/aggregate |
| H. | Cyber Terrorism | $100,000 each *claim*/aggregate |
| I. | BrandGuard® | $100,000 each *claim*/aggregate |
| J. | Cyber Crime | $ 25,000 each *claim*/aggregate |

2.  **Medefense Plus Limits**
    (each *insured entity* and *insured healthcare professional*):

| | | |
|---|---|---|
| K. | Medefense Plus Regulatory Proceedings Coverage | $50,000 each *claim*/aggregate |

3.  **Combined Annual Aggregate Limit** (all *insureds* and all Coverage Agreements combined):

|  |  |
|---|---|
| 0- 1 Physician: | $100,000 aggregate |
| 2-10 Physicians: | $200,000 aggregate |
| 11-20 Physicians: | $300,000 aggregate |
| 21+ Physicians: | $500,000 aggregate |

# NOTICE

This Endorsement provides Cyber Solutions and Medefense Plus insurance on a Claims-Made and Reported basis.

Read the entire Endorsement carefully to determine your rights and duties and what is and is not covered. The terms, conditions, exclusions, and limits of liability set forth in this Endorsement apply only to Cyber Solutions and Medefense Plus insurance.

The Cyber Solutions and Medefense Plus limits of liability are specified in the Schedule of Limits ("Schedule") shown above. Such limits are in addition to, and will not erode, the limits provided elsewhere under the Policy. *Defense costs* paid under this Endorsement will erode the limits set forth in the Schedule.

Throughout this Endorsement, the words "we," "us," "our" refer to the Company that issued the Policy and this Endorsement. Other words and phrases that appear in bold-face and italicized print have special meaning. Refer to **SECTION TEN – DEFINITIONS** of this Endorsement.

## SECTION ONE – COVERAGE AGREEMENTS

A.  Multimedia Liability: Subject to the limits shown in the Schedule, we agree to pay *loss*, including liability *assumed under contract*, which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* for an actual or alleged *multimedia peril*, provided that:

   1.  Such *claim* is first made against the *insured* during the *endorsement period*; and
   2.  Such *claim* is reported to us during the *endorsement period*.

B.  Security and Privacy Liability: Subject to the limits shown in the Schedule, we agree to pay *loss*, including liability *assumed under contract*, which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* for a *security and privacy wrongful act*, provided that:

   1.  Such *claim* is first made against the *insured* during the *endorsement period*; and
   2.  Such *claim* is reported to us during the *endorsement period*.

C.  Privacy Regulatory Defense and Penalties: Subject to the limits shown in the Schedule, we agree to pay *regulatory fines and penalties* (to the extent insurable by law) and *regulatory compensatory awards* which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* resulting from a *security breach* or *privacy breach*, provided that:

   1.  Such *claim* is first made against the *insured* during the *endorsement period*; and
   2.  Such *claim* is reported to us during the *endorsement period*.

D.  PCI DSS Assessment: Subject to the limits shown in the Schedule, we agree to pay *PCI DSS assessments* which an *insured* becomes legally obligated to pay, and related *defense costs*, because of a *claim* for a *security breach* or *privacy breach*, provided that:

   1.  Such *claim* is first made against the *insured* during the *endorsement period*; and
   2.  Such *claim* is reported to us during the *endorsement period*.

E.  Privacy Breach Response Costs, Patient Notification Expenses and Patient Support and Credit Monitoring Expenses: Subject to the limits shown in the Schedule, we agree to pay *privacy breach response costs, patient notification expenses* and *patient support and credit monitoring expenses* which *you* incur as a direct result of an *adverse media report, security breach* or *privacy breach*, provided that:

   1.  The *adverse media report, security breach* or *privacy breach* is first discovered by an *insured* during the *endorsement period*; and
   2.  The *adverse media report, security breach* or *privacy breach* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *adverse media report, security breach* or *privacy breach*.

F.  Network Asset Protection

   1.  Data Recovery

      Subject to the limits shown in the Schedule, we agree to pay *digital assets loss* and *special expenses* which *you* incur as a direct result of a *covered cause of loss* that causes damage to, or alteration, corruption, distortion, theft, misuse or destruction of, *your digital assets*, provided that:

      a)  The *covered cause of loss* is first discovered by an *insured* during the *endorsement period*;

    b)     The *covered cause of loss* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *covered cause of loss*; and

    c)     *You* provide clear evidence that the *digital assets loss* and *special expenses* directly resulted from the *covered cause of loss*.

We will pay *digital assets loss* and/or *special expenses* for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of *your digital assets*.

2.     <u>Non-Physical Business Interruption and Extra Expense</u>

Subject to the limits shown in the Schedule, we agree to pay *income loss*, *interruption expenses* and *special expenses* which *you* incur during the *period of restoration*, but after the *waiting period*, as a direct result of a *covered cause of loss* that causes a total or partial interruption, degradation in service or failure of *your computer system*, provided that:

    a)     The *covered cause of loss* is first discovered by an *insured* during the *endorsement period*;

    b)     The *covered cause of loss* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *covered cause of loss*; and

    c)     *You* provide clear evidence that the *income loss*, *interruption expenses* and *special expenses* directly resulted from the *covered cause of loss*.

G.     <u>Cyber Extortion</u>:  Subject to the limits shown in the Schedule, we agree to pay *cyber extortion expenses* and *cyber extortion monies* which *you* incur as a direct result of a *cyber extortion threat*, provided that:

1.     Such *cyber extortion threat* is first made against an *insured* during the *endorsement period*;

2.     The *cyber extortion threat* is reported to us no later than sixty (60) days from the date the *cyber extortion threat* is made against an *insured*; and

3.     *You* provide clear evidence that the *cyber extortion expenses* and *cyber extortion monies* directly resulted from the *cyber extortion threat*.

We will not pay *cyber extortion expenses* or *cyber extortion monies* that are incurred without our prior consultation and written authorization. *You* must make every reasonable effort to notify local law enforcement authorities and the Federal Bureau of Investigation or any similar equivalent foreign agency before surrendering any *cyber extortion monies* in response to a *cyber extortion threat*.

H.     <u>Cyber Terrorism</u>:  Subject to the limits shown in the Schedule, we agree to pay *income loss*, *interruption expenses* and *special expenses* which *you* incur during the *period of restoration*, but after the *waiting period*, as a direct result of an *act of cyber terrorism* that causes a total or partial interruption, degradation in service or failure of *your computer system*, provided that:

1.     The *act of cyber terrorism* is first discovered by an *insured* during the *endorsement period*;

2.     The *act of cyber terrorism* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *act of cyber terrorism*; and

3.     *You* provide clear evidence that the *income loss*, *interruption expenses* and *special expenses* directly resulted from the *act of cyber terrorism*.

I.     <u>BrandGuard®</u>: Subject to the limits shown in the Schedule, we agree to reimburse *you* for provable and ascertainable *brand loss* which *you* sustain during the *period of indemnity*, but after the *waiting period*, as a direct result of an *adverse media report* or *notification*, provided that:

1.     The *brand loss* is first discovered by an *insured* during the *endorsement period*;

2.     The *brand loss* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *brand loss*; and

3.     *You* provide clear evidence that the *brand loss* directly resulted from the *adverse media report* or *notification*.

J.     <u>Cyber Crime</u>:

1.     <u>Financial Fraud</u>:  Subject to the limits shown in the Schedule, we agree to pay *financial fraud loss* which *you* sustain as a direct result of *financial fraud*, provided that:

    a)     The *financial fraud* is first discovered by an *insured* during the *endorsement period*;

    b)     The *financial fraud* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *financial fraud*; and

    c)     *Your* bank or credit card company has refused to reverse or prevent a payment transaction, or to indemnify *you* for the *financial fraud loss*, and you provide us with written confirmation of such refusal.

2. Telecommunications Fraud: Subject to the limits shown in the Schedule, we agree to pay *telecommunications fraud loss* which *you* sustain as a direct result of *telecommunications fraud*, provided that:

   a) The *telecommunications fraud* is first discovered by an *insured* during the *endorsement period*; and
   b) The *telecommunications fraud* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *telecommunications fraud*.

3. Phishing Attack: Subject to the limits shown in the Schedule, we agree to pay *phishing attack loss* which *you* sustain as a direct result of a *phishing attack* provided that:

   a) The *phishing attack* is first discovered by an *insured* during the *endorsement period*; and
   b) The *phishing attack* is reported to us no later than sixty (60) days from the date an *insured* first discovers the *phishing attack*.

K.    Medefense Plus Regulatory Proceedings Coverage: Subject to the limits set forth in the Schedule, we agree to reimburse an *insured* for *defense costs* and *shadow audit expenses* the *insured* incurs, and *regulatory fines and penalties* (to the extent insurable by law) imposed against the *insured*, because of a *claim* for *wrongful acts*, including a *claim* resulting from *voluntary self-disclosure*, provided that:

1. Such *claim* is first made against the *insured* during the *endorsement period*; and
2. Such *claim* is reported to us during the *endorsement period*.

We have no duty to defend under the Medefense Plus Regulatory Proceedings Coverage Agreement, but only to reimburse covered *defense costs*, *shadow audit expenses*, and *regulatory fines and penalties* incurred by the *insured*. The *insured* will have complete freedom of choice with respect to the selection of the licensed attorney who provides legal services in connection with any *claim* covered under this Coverage Agreement. Attorney rates will be capped at a maximum of $300 per hour. All counsel must comply with our reasonable defense counsel guidelines.

# SECTION TWO – DEFENSE, INVESTIGATION, AND SETTLEMENT

We will have the right and duty to defend any *claim* covered under Coverage Agreement A, Coverage Agreement B, Coverage Agreement C, or Coverage Agreement D of this Endorsement, even if the allegations of the *claim* are groundless, false or fraudulent. However, we shall not be obligated to pay or defend any *claim* after the applicable limit of liability hereunder has been exhausted. We have the right to appoint counsel to defend any such *claim*.

We may investigate or settle any *claim* at our discretion. The limits of liability will be reduced and may be completely exhausted by payment of *defense costs*. We will not be obligated to pay or defend any *claim* after the limits of liability hereunder have been exhausted.

No *insured* will incur any *defense costs* or other expenses, or settle any *claim*, assume any contractual obligation, admit liability, voluntarily make any payment, or otherwise consent to any settlement or judgment with respect to any *claim* without our prior written consent, which will not be unreasonably withheld. We will not be liable for any *defense costs* or other expenses, or settlement or judgment to which we have not consented.

# SECTION THREE – EXCLUSIONS

The insurance provided under this Endorsement does not apply to:

A.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any *multimedia peril, security and privacy wrongful act, security breach, privacy breach, adverse media report, covered cause of loss, cyber extortion threat, act of cyber terrorism, notification, financial fraud, telecommunications fraud, phishing attack,* or *wrongful act*:

1. Which was the subject of written notice given to us or to any other insurer prior to the effective date of the first Cyber Solutions Endorsement issued to *you* and continuously renewed thereafter;
2. Which was the subject of any written demand made against an *insured*, or a civil, administrative or arbitration proceeding commenced against an *insured*, prior to the effective date of the first Cyber Solutions Endorsement issued to *you* and continuously renewed thereafter, or that involved the same or substantially the same fact, circumstance, or situation underlying or alleged in such prior demand or proceeding;
3. That was identified in any summary or statement of *claims* or potential *claims* submitted in connection with *your* application for insurance with us; or
4. Which an *insured* had knowledge of prior to the effective date of the first Cyber Solutions Endorsement issued to *you* and continuously renewed thereafter.

B.    Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction, request or voluntary decision to test for,

abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste. For purposes of this exclusion, "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including mold, smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products and waste, and any electric, magnetic or electromagnetic field of any frequency. "Waste" includes, but is not limited to, material that is or is to be recycled, reconditioned or reclaimed.

C.  Any *claim* for liability assumed by an *insured* under any oral or written contract or agreement, except where such liability would apply apart from such contract or agreement and is otherwise covered by this Endorsement. With respect to any *multimedia peril*, *security breach* or *privacy breach*, this exclusion does not apply to any *claim* alleging liability *assumed under contract*.

D.  Any *claim* for breach of any express, implied, actual or constructive contract, warranty, guarantee, or promise, except where such liability would apply apart from such contract, warranty, guarantee or promise and is otherwise covered by this Endorsement. This exclusion does not apply to any *claim* alleging breach of *your* privacy policy or any *claim* for liability *assumed by contract*.

E.  Any business, joint venture or enterprise which is not identified in a schedule or endorsement to the Policy.

F.  Any conduct, act, error or omission of any person serving in any capacity other than as *your* principal, partner, officer, director or employee.

G.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any of the following, if committed by an *insured*, whether acting alone or in collusion with other persons:

    1.  Any willful, deliberately dishonest, malicious, or fraudulent act or omission;
    2.  Any intentional violation of the law or *your* privacy policy; or
    3.  The gaining in fact of any profit, remuneration or financial advantage to which an *insured* was not legally entitled.

Notwithstanding the foregoing, the insurance afforded by this Endorsement will apply to *defense costs* incurred in defending any such *claim* until such time as there is a judgment or other final adjudication adverse to the *insured* establishing such willful, dishonest, fraudulent, or malicious conduct. We will have the right to recover *defense costs* incurred in defending such *claim* from those parties found to have committed such willful, dishonest, fraudulent, or malicious conduct.

This exclusion shall not apply to:

    1.  Any *insured* that did not commit, participate in, or have knowledge of the conduct described in this exclusion; or
    2.  With respect to Coverage Agreement F (Network Asset Protection), a *claim* resulting from employee sabotage.

H.  Any *claim* for violation of the False Claims Act or any similar federal or state law, rule, or regulation concerning *billing errors* or fraudulent billing practices or abuse. This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement K of this Endorsement.

I.  Any *claim* for infringement of any patent or the misappropriation, theft, copying, display, or publication of any trade secret.

J.  Any *claim* for unfair competition, price fixing, deceptive trade practices, restraint of trade, or violation of any anti-trust laws.

K.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

    1.  Any employment or employment-related matters, including, but not limited to, employer-employee relations, policies, acts or omissions;
    2.  Any actual or alleged refusal to employ any person or any other actual or alleged misconduct with respect to employees; or
    3.  Any actual or alleged obligations of an *insured* under any workers' compensation, unemployment insurance, social security, disability benefits or other similar law.

This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement B of this Endorsement, which is brought by *your* past, present or future employee alleging a *security and privacy wrongful act*.

L.  Any claim for *bodily injury* or *property damage*.

M.  Any *claim* for harassment or discrimination because of, or relating to, race, creed, color, age, sex, sexual orientation or preference, national origin, religion, handicap, disability, political affiliation, marital status, or any other basis prohibited by federal, state or local law.

N.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1. Satellite failures;
2. Electrical or mechanical failures and/or interruption including, but not limited to, electrical disturbance, spike, brownout, or blackout; or
3. Outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under *your* direct operational control and such *claim* is otherwise covered under Coverage Agreement F or Coverage Agreement H of this Endorsement.

O.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving an *insured's* insolvency or bankruptcy, the insolvency or bankruptcy of any other individual or entity, or the failure, inability or unwillingness to make payments because of the insolvency, liquidation, or bankruptcy of any individual or entity.

P.  Any *claim* brought by or on behalf of:

1. Any *insured* against another *insured*;
2. Any entity which is owned, in whole or in part, by an *insured*, or any entity directly or indirectly controlled, operated or managed by an *insured*;
3. Any entity which is a parent, affiliate or subsidiary of any entity, business or joint venture in which an *insured* is a partner; or
4. Any individual who is a partner of any entity, business or joint venture in which an *insured* is also a partner.

This exclusion does not apply to:

1. An otherwise covered *claim* under Coverage Agreement B of this Endorsement, which is brought by *your* past, present or future employee alleging a *security and privacy wrongful act*; or
2. An otherwise covered *claim* under Coverage Agreement K of this Endorsement that is brought by an *insured* as a *qui tam plaintiff* against another *insured*.

Q.  Any *claim* for violation of any of United States of America's economic or trade sanctions, including, but not limited to, sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

R.  Any *claim* for the actual or alleged failure to render professional services.

S.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the wear and tear, drop in performance, progressive deterioration, or aging of *your* electronic equipment or *computer hardware*.

T.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the failure of overhead transmission and distribution lines.

U.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the gradual deterioration of subterranean insulation.

V.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure or any other physical event, however caused.

W.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the gradual deterioration or wear and tear of, or latent damage to, *your computer system*.

X.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services.

Y.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving cost guarantees, cost representations, contract price or cost estimates being exceeded.

Z.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving unauthorized trading. For purposes of this exclusion, "unauthorized trading" means trading, which at the time of the trade is:

1. In excess of permitted financial limits; or
2. Outside of permitted product lines.

AA.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1. The actual or alleged purchase or sale of *securities*, or an offer or solicitation of an offer to purchase or sell *securities*;
2. The actual or alleged loss of value of any *securities*; or
3. Any actual or alleged violation of any *securities* law such as the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including "Blue Sky" laws, whether such law is statutory, regulatory or common law.

BB.  Any *claim* for violation of the Organized Crime Control Act of 1970 (commonly known as 'Racketeer Influenced And Corrupt Organizations Act' or 'RICO'), as amended, or any regulation promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such law is statutory, regulatory or common law.

CC.  Any *claim* which is brought by the Federal Trade Commission, the Federal Communications Commission or any other federal, state or local governmental entity, in such entity's regulatory or official capacity. This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement C or Coverage Agreement K of this Endorsement.

DD.  Any *claim* alleging:

1. The violation of any pension, healthcare, welfare, profit sharing or mutual or investment plans, funds or trusts; or
2. The violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling or order issued pursuant thereto.

EE.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1. Strikes or similar labor actions, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;
2. The confiscation, nationalization, requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or
3. Any action taken in controlling, preventing, suppressing or in any way relating to (1) or (2) above.

This exclusion does not apply to an *act of cyber terrorism*.

FF.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving an *insured's* commercial decision to cease providing a particular product or service, but only if an *insured* is contractually obligated to continue providing such products or services.

GG.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving:

1. Gambling or pornography;
2. Prizes, awards or coupons; or
3. The sale or provision of prohibited, restricted or regulated items such as alcoholic beverages, tobacco or drugs.

HH.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the use of programs that are not *operational programs* or *delivered programs*.

II.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any *insured's* intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

JJ.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the confiscation, commandeering, requisition, destruction of, or damage to *computer hardware* by order of a government de jure or de facto or by any public authority for whatever reason.

KK.  Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

LL.  Any *criminal proceeding*.

MM.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the actual or alleged violation of the Telephone Consumer Protection Act (47 U.S.C.§227), the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C.§§ 6101-6108), or the CAN-SPAM Act (15 U.S.C. §§ 7701-7713), each as amended, or any regulations promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such laws are statutory, regulatory or common  law, including any anti-spam law or other law concerning the use of telephonic or electronic communications for solicitation purposes, or any allegations of invasion or violation of any rights to privacy derived therefrom.  This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement B or Coverage Agreement C of this Endorsement which alleges a violation of the CAN-SPAM Act, as amended, or any regulations promulgated thereunder, or any similar federal, state, local or foreign law, whether such law is statutory, regulatory or common law, but only if such violation arises out of a *security breach*.

NN.   Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any:

1.   Any violation of the *PCI Data Security Standard* or any payment card company rules; or
2.   The failure to implement, maintain or comply with any security measures or standards related to payment card *data*, including any fine or penalty imposed by a payment card company on a merchant bank or payment processor that *you* have paid or agreed to reimburse or indemnify.

This exclusion does not apply to an otherwise covered *claim* under Coverage Agreement D of this Endorsement.

OO.   With respect to Coverage Agreement F.1. of this Endorsement:

1.   Any amount incurred in restoring, updating or replacing *digital assets* to a level beyond that which existed prior to the *covered cause of loss*;
2.   Physical damage to the *computer hardware* or *data* center, other than accidental physical damage or destruction of *electronic media*, so that stored *digital assets* are no longer machine-readable;
3.   Contractual penalties or consequential damages;
4.   Any liability to third parties for whatever reason, including legal costs and expenses of any type;
5.   Fines or penalties imposed by law;
6.   The economic or market value of *digital assets*;
7.   Costs or expenses incurred to identify, patch or remediate software program errors or *computer system* vulnerabilities;
8.   Costs to upgrade, redesign, reconfigure or maintain *your computer system* to a level of functionality beyond that which existed prior to the *covered cause of loss*; or
9.   Any losses paid under Coverage Agreement F.2 of this Endorsement.

PP.   With respect to Coverage Agreement F.2. of this Endorsement:

1.   Any amount incurred in updating or replacing *digital assets* to a level beyond that which existed prior to the *covered cause of loss*;
2.   Contractual penalties or consequential damages;
3.   Any liability to third parties for whatever reason, including legal costs and expenses of any type;
4.   Fines or penalties imposed by law;
5.   Costs or expenses incurred to identify, patch or remediate software program errors or *computer system* vulnerabilities;
6.   Loss of goodwill or reputational harm;
7.   Costs to upgrade, redesign, reconfigure or maintain *your computer system* to a level of functionality beyond that which existed prior to the *covered cause of loss*; or
8.   Any losses paid under Coverage Agreement F.1 of this Endorsement.

QQ.   With respect to Coverage Agreement I of this Endorsement:

1.   Any amount incurred by *you* in an effort to re-establish *your reputation*, including *public relations expenses*;
2.   Any amount incurred in any *claim* that is insured by any other insurance, except excess    insurance;
3.   Any amount incurred in connection with an *adverse media report* that also affects or refers in similar terms to a general security issue, an industry or *your* specific competitors without any specific allegations regarding a *privacy breach* or *security breach* by an *Insured*, a *BPO service provider*, an *outsourced IT service provider*, or by others acting on *your* behalf and for whom *you* are legally responsible;
4.   Any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;
5.   Contractual penalties or consequential damages;
6.   *Privacy breach response costs*, *patient notification expenses* or *patient support and credit monitoring expenses* paid under Coverage Agreement E of this Endorsement; or

7.     Fines or penalties imposed by law or regulation.

RR.     With respect to Coverage Agreement J of this Endorsement:

1.     Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any actual or alleged unauthorized acquisition, access, use or disclosure of *private information* that is held or transmitted in any form;

2.     Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the seizure, confiscation, nationalization, requisition, or destruction of an *insured telecommunications system* by, or under the order of, any government or public authority;

3.     Any amounts that have been wholly or partially reversed by a credit card company or financial institution.

Exclusion RR.1. does not apply to *financial fraud* which directly results from the use of *private information*.

SS.     With respect to Coverage Agreement J.1 (Financial Fraud):

1.     Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving any fraudulent instruction, if the sender, or any person or organization acting in collusion with the sender, ever had authorized access to *your* password, PIN or other security code;

2.     Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving the giving or surrendering of *money*, *securities*, or *other property* in any exchange for or purchase of goods, products or services:

a)     That are not yet delivered, whether or not fraudulent;

b)     That fail to conform to advertised quality or performance; or

c)     That fail to conform to the quality or performance expected from the standpoint of an *insured*.

3.     Any *claim* based upon, arising out of, resulting from, in consequence of, or in any way involving potential income, including interest and dividends, not realized by *you* or *your* customers.

Exclusion SS.1. does not apply to a fraudulent instruction transmitted by *your* employee, if the fraudulent instruction was transmitted as a result of that employee receiving intentionally misleading or deceptive telephonic or electronic communications from a *third party* who is falsely purporting to be *you* or *your* client, vendor, or employee.

TT.     With respect to Coverage Agreement K of this Endorsement:

1.     Any amounts incurred in connection with a *shadow audit* not previously approved by us;

2.     Any amounts intended to serve as *restitution*;

3.     Any amounts incurred by a consulting professional whose services were not previously approved by us; or

4.     Any *claim* based upon, arising from, or in any way involving *billing errors* for medical services, items or products which are not provided or prescribed by an *insured* on *your* behalf.

## SECTION FOUR – LIMITS OF LIABILITY

### A.     LIMITS PER COVERAGE AGREEMENT

1.     The Cyber Solutions Limits shown in Item 1 of the Schedule are the most we will pay for each *claim* and in the aggregate under each Cyber Solutions Coverage Agreement of this Endorsement, including *defense costs* where applicable. Subject to the Combined Annual Aggregate Limit and the related *claims* provisions, the Cyber Solutions Limits will apply separately to each *insured healthcare professional* and *insured entity*.

2.     The Medefense Plus Limits shown in Item 2 of the Schedule are the most we will pay for each *claim* and in the aggregate under the Medefense Plus Coverage Agreement of this Endorsement, including *defense costs*. Subject to the Combined Annual Aggregate Limit, the Medefense Plus Limit will apply separately to each *insured healthcare professional* and *insured entity*.

3.     *Insured healthcare professionals* share the applicable limit of liability with their employees, volunteers and independent contractors. An *insured entity* shares the applicable limit of liability with their employees, volunteers and independent contractors.

4.     All amounts paid under the Cyber Solutions Coverage Agreements and the Medefense Plus Coverage Agreement will reduce, and may completely exhaust, the Combined Annual Aggregate Limit.

### B.     COMBINED ANNUAL AGGREGATE LIMIT

1.     The Combined Annual Aggregate Limit shown in Item 3 of Schedule is the most we will pay for all *claims* made during the *endorsement period* under all Cyber Solutions Coverage Agreements and the Medefense Plus

Coverage Agreement combined, including *defense costs* where applicable. The Combined Annual Aggregate Limit is shared by all *insureds*.

2. The Combined Annual Aggregate Limit is based on the number of physicians in an *insured entity* as of the effective date of this Endorsement. If the *insured entity* is a facility or hospital, the Combined Annual Aggregate Limit is based on the number of physicians employed by the facility or hospital as of the effective date of this Endorsement.

3. If the Combined Annual Aggregate Limit is exhausted by payment of *loss, defense costs, PCI DSS assessments, regulatory compensatory awards, regulatory fines and penalties, privacy breach response costs, patient notification expenses, patient support and credit monitoring expenses, digital assets loss, special expenses, income loss, interruption expenses, cyber extortion expenses, cyber extortion monies, brand loss, financial fraud loss, telecommunications fraud loss, phishing attack loss, shadow audit expenses*, or any combination thereof, then our obligations under this Endorsement shall be deemed completely fulfilled and extinguished.

C. **RELATED CLAIMS**

1. With respect to Coverage Agreement A, B, C, D and K of this Endorsement, all related *claims* made against an *insured* will be considered a single *claim*, and only one "each *claim*" limit will apply to such *claim*. Such *claim* shall be deemed to have been first made on the date the earliest of the related *claims* is first made against an *insured* and shall be deemed to have been first reported to us on the date the earliest of the related *claims* is first reported to us. Appeals and any post-trial proceedings shall be considered part of the original *claim*. *Claims* will be deemed related if they are logically or causally connected by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions.

2. With respect to Coverage Agreement E, F, G, H, I and J of this Endorsement, all *claims* arising out of the same, related or continuing incident(s), act(s), fact(s) or circumstance(s) will be considered a single *claim*, and only one "each *claim*" limit will apply, regardless of the number of *claims* made or the number of *insureds* involved or affected. Related *claims* will be deemed first reported to us on the date the earliest of such related *claims* is first reported to us.

3. If a *claim* is covered under more than one Coverage Agreement of this Endorsement, then only one "each *claim*" limit will apply. We will allocate *claims* paid, if any, against the appropriate limit of liability.

**SECTION FIVE – NOTICE PROVISIONS**

A. **NOTICE OF CLAIM**

1. As a condition precedent to coverage under Coverage Agreement A, B, C, D or K of this Endorsement, the *insured* must give us written notice of any *claim* during the *endorsement period*.

2. As a condition precedent to coverage under Coverage Agreement E, F, G, H, I or J of this Endorsement, *you* must give us written notice of any *claim* no later than 60 days from the date an *insured* first discovers the event or incident giving rise to such *claim*.

3. All *insureds* must provide us with copies of all documentation comprising the *claim* as well as any authorization, cooperation, or assistance as we may require.

4. We will not be obligated to pay any amounts incurred prior to notice of a *claim* to us or amounts incurred without our prior written consent.

B. **NOTICE OF POTENTIAL CLAIM**

If, during the *endorsement period*, any *insured* first becomes aware of any facts or circumstances which could give rise to a *claim* covered under this Endorsement, and if the *insured* provides us with written notice during the *endorsement period* of:

1. The details regarding such facts or circumstances;
2. The nature of the loss incurred;
3. The identity of the potential claimant(s) and *insured(s)* involved;
4. The manner in which the *insured* first became aware of the facts or circumstances; and
5. The consequences which have resulted or may result therefrom,

then any *claim* arising out of such reported facts or circumstances will be deemed to be a *claim* first made on the date notice complying with the foregoing requirements is first received by us.

**SECTION SIX – LOSS DETERMINATION**

A.    **DATA RECOVERY**

For any and all coverage provided under Coverage Agreement F.1. of this Endorsement, *digital assets loss* will be determined as follows:

1.    If the impacted *digital asset* was purchased from a *third party*, we will pay only the lesser of the original purchase price of the *digital asset* or the reasonable and necessary *digital assets loss*.
2.    If it is determined that the *digital assets* cannot be replaced, restored or recreated, then we will only reimburse the actual and necessary *digital assets loss* incurred up to such determination.

B.    **NON-PHYSICAL BUSINESS INTERRUPTION AND EXTRA EXPENSE AND CYBER TERRORISM**

For any and all coverage provided under Coverage Agreement F.2. or Coverage Agreement H of this Endorsement, *income loss* will be determined as the reduction of *your* income during the *period of restoration*, which is:

1.    *Your* net income (net profit or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of a total or partial interruption, degradation in service or failure of *your computer system* caused directly by a *covered cause of loss* or an *act of cyber terrorism*, whichever applies. The income projection will take into account the prior experience of *your* business preceding the date of the *covered cause of loss* or the *act of cyber terrorism* and the probable experience had no *covered cause of loss* or *act of cyber terrorism* occurred. Income will include the amount paid or payable to *you* for goods, products or services sold, delivered or rendered in the normal course of *your* business. The income projection will be reduced by the extent to which *you* use substitute methods, facilities or personnel to maintain *your* revenue stream. We will take into consideration *your* documentation of the trends in *your* business and variations in, or other circumstances affecting, *your* business before or after the *covered cause of loss* or the *act of cyber terrorism*, which would have affected *your* business had no *covered cause of loss* or *act of cyber terrorism* occurred; and
2.    Any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the *period of restoration*.

C.    **BRANDGUARD**

For any and all coverage provided under Coverage Agreement I of this Endorsement, *brand loss* will be calculated by taking into account the prior experience of *your* business preceding the date of the *adverse media report* or *notification*, whichever applies, and the probable experience had no *adverse media report* been published or *notification* occurred. Income will include the amount paid or payable to *you* for goods, products or services sold, delivered or rendered in the normal course of *your* business. The income projection will be reduced by the extent to which *you* use substitute methods, facilities, or personnel to maintain *your* revenue stream. We will take into consideration *your* documentation of the trends in *your* business and variations in, or other circumstances affecting, *your* business before or after the *adverse media report* or *notification*, which would have affected *your* business had no *adverse media report* been published or *notification* occurred. Any fixed operating expenses (including ordinary payroll) incurred will be considered in calculating *brand loss*, but only to the extent that such operating expenses must continue during the *period of indemnity*.

**SECTION SEVEN – MEDEFENSE PLUS SPECIAL CONDITIONS**

A.    **VOLUNTARY SELF-DISCLOSURE**

In the event any *defense costs, shadow audit expenses* or *regulatory fines and penalties* covered under Coverage Agreement K of this Endorsement arise out of *voluntary self-disclosure*, the *insured* must establish that the circumstances giving rise to the *voluntary self-disclosure* became known to the *insured* fortuitously and subsequent to the original inception date of this coverage.

B.    **SHADOW AUDITS**

The *insured* shall not have a *shadow audit* performed without our prior approval of the *shadow audit* and its expense. Only *shadow audit expenses* from previously approved *shadow audits* will be reimbursed under this Endorsement. We will not unreasonably withhold such approval.

C.    **REGULATORY FINES AND PENALTIES REIMBURSEMENT**

We will reimburse the *insured* for *regulatory fines and penalties* which are the subject of final adjudication by an administrative tribunal or court, or are the subject of a settlement agreement or stipulated judgment to which we have given our prior written consent. The *insured* shall not admit or assume any liability for *regulatory fines and penalties*, enter into any settlement agreement, or stipulate to any judgment for *regulatory fines and penalties* without our prior

written consent. Only those settlements or stipulated judgments for *regulatory fines and penalties* to which we have consented in writing shall be reimbursable under this Endorsement. We will not unreasonably withhold consent.

## SECTION EIGHT – REPORTING PERIOD COVERAGE

A.   In the event the Policy non-renews or terminates for any reason other than non-payment of premium, we will provide, at no additional charge, an Automatic Reporting Period of sixty (60) days within which *claims* may be reported. The Automatic Reporting Period begins on the effective date of Policy non-renewal or termination, whichever is earlier. Such Automatic Reporting Period shall apply only to:

1.   *Claims* under Coverage Agreement A, B, C, D, or K of this Endorsement which:

   (a)   Arise out of actual or alleged *multimedia perils, security and privacy wrongful acts, security breaches, privacy breaches,* or *wrongful acts* that occur before the end of the *endorsement period*;
   (b)   Are first made against an *insured* during the *endorsement period;* and
   (c)   Are reported to us during the automatic reporting period.

2.   *Claims* under Coverage Agreement E, F, H, I or J of this Endorsement which:

   (a)   Arise out of *adverse media reports, security breaches, privacy breaches, covered causes of loss, acts of cyber terrorism, financial fraud, telecommunications fraud* or *phishing attacks* that occur before the end of the *endorsement period*; and
   (b)   Are first discovered and reported to us during the automatic reporting period.

3.   *Claims* under Coverage Agreement G of this Endorsement which:

   (a)   Arise out of *cyber extortion threats* that are made during the *endorsement period*, but prior to the expiration, cancellation or termination of the Policy; and
   (b)   Are reported to us during the automatic reporting period.

B.   In the event the Policy non-renews or terminates for any reason other than non-payment of premium, *you* will have the right to purchase an Extended Reporting Period within which *claims* may be made and reported. If purchased, the Extended Reporting Period begins on the effective date of Policy non-renewal or termination and shall apply only to:

1.   *Claims* under Coverage Agreement A, B, C, D, or K of this Endorsement which:

   (a)   Arise out of actual or alleged *multimedia perils, security and privacy wrongful acts, security breaches, privacy breaches,* or *wrongful acts* that occur before the end of the *endorsement period*; and
   (b)   Are first made against an *insured* and reported to us during the Extended Reporting Period.

2.   *Claims* under Coverage Agreement E, F, H, I or J of this Endorsement which:

   (a)   Arise out of *adverse media reports, security breaches, privacy breaches, covered causes of loss, acts of cyber terrorism financial fraud, telecommunications fraud* or *phishing attacks* that occur before the end of the *endorsement period*; and
   (b)   Are first discovered during the Extended Reporting Period; and
   (c)   Are reported to us no later than sixty (60) days from the date an *insured* first discovers the *adverse media reports, security breaches, privacy breaches, covered causes of loss, acts of cyber terrorism financial fraud, telecommunications fraud* or *phishing attacks* giving rise to the *claim.*

3.   *Claims* under Coverage Agreement G of this Endorsement which:

   (a)   Arise out of *cyber extortion threats* that are made during the Extended Reporting Period; and
   (b)   Are reported to us no later than sixty (60) days from the date the *cyber extortion threat* is made against an *insured.*

As a condition precedent to the right to purchase the Extended Reporting Period, the total earned premium for the Policy must be paid. The right to purchase the Extended Reporting Period will terminate unless written notice of the intent to purchase the Extended Reporting Period, together with full payment of the premium for the Extended Reporting Period, is received by us within sixty (60) days after the effective date of termination, or, in the event of non-renewal, within sixty (60) days after the Policy expiration date. If such notice and premium payment is not so given to us, there will be no right to purchase the Extended Reporting Period. We will determine the additional premium for the Extended Reporting Period in accordance with our rules and rates.

C.  All terms and conditions of this Endorsement, including the limits of liability set forth in the Schedule, will continue to apply during the Extended Reporting Period. The existence of an Extended Reporting Period will not increase or reinstate the limits of liability.

D.  If similar insurance is in force during the Automatic Reporting Period or the Extended Reporting Period, the coverage provided by this Endorsement shall be excess over any such valid and collectible insurance.

## SECTION NINE – OTHER INSURANCE

The coverage provided by this Endorsement is excess insurance over any other valid and collectible insurance available, including any self-insured retention or deductible portion thereof, whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such insurance specifically applies as excess insurance over the insurance provided under this Endorsement.

## SECTION TEN - DEFINITIONS

With respect to the coverage provided by this Endorsement, certain words are shown in bold and italics and are defined as follows. If a term is defined below and in *your* Policy, the definition below applies only to the coverage provided by this Endorsement.

*Acquiring bank* means a bank or financial institution that accepts credit and/or debit card payments (including credit cards, debits cards, stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

*Act of cyber terrorism* means the premeditated use of information technology to organize and execute attacks, or the threat thereof, against computers, *computer systems*, networks or the internet by any person or group, whether acting alone, on behalf of, or in connection with, any organization or government, which is committed for political, religious, or ideological purposes, with the intention to influence any government, put the public in fear, or cause destruction or harm to critical infrastructure or *data*.

*Adverse media report* means any unpredictable report or communication of an actual or potential *security breach* or *privacy breach*, which:

A.  Has been publicized through any media channel including, but not limited to, television, *print media*, radio or electronic networks, the internet, or electronic mail; and

B.  Threatens material damage to *your reputation* or brands.

*Assumed under contract* means liability for *loss* resulting from a *multimedia peril, security breach* or *privacy breach* where such liability has been assumed by an *insured* in the form of a written hold harmless or indemnity agreement, provided that such agreement was executed prior to the date the *multimedia peril, security breach*, or *privacy breach* occurred.

*Billing error* means the actual or alleged presenting of, or causing or allowing to be presented, any erroneous billings by an *insured* to a government health benefit payer or program or *commercial health insurance payer*, from which the *insured* seeks, or has received, payment or reimbursement for medical services, items or products provided or prescribed by an *insured*.

*Billing errors proceeding* means any of the following brought against an *Insured*, but only if alleging *billing errors*:

A.  A *qui tam action*; or

B.  A written demand made against an *insured* by or on behalf of a *government entity* or *commercial health insurance payer*.

*Billing errors proceeding* does not include:

A.  A customary or routine audit or billing inquiry conducted by a *government entity* or *commercial health insurance payer*, including any request for documentation to support a submission for payment or reimbursement;

B.  A *criminal proceeding*; or

C.  A subpoena for records, testimony, or other documentation which does not allege a *billing error*.

All actions taken by a *government entity* or *commercial health insurance payer* arising out of the same or a similar *billing error* will be deemed to constitute a single *billing errors proceeding*, regardless of the number and identity of claimants, the number and identity of *insureds* involved, or whether further action arising out of the same or a similar *billing error* is taken during the effective period of a subsequent policy issued by us.

*Bodily injury* means physical injury, sickness, disease, pain or death, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress sustained by a person at any time.

*BPO service provider* means any third-party independent contractor that provides business process outsourcing services for *your* benefit under a written contract with *you*, including, but not limited to, call center services, fulfillment services, and logistical support.

*Brand loss* means *your* income as could have been reasonably projected immediately prior to *notification* or, in the event of an *adverse media report*, immediately prior to the publication of an *adverse media report*, but which has been lost as a direct result of such *notification* or *adverse media report*, less the variable costs (including the cost of raw materials and all other costs) that would have been incurred during the same period, but were saved as a result. *Brand loss* will be determined in accordance with Section Six, C, of this Endorsement.

*Card association* means Visa International, Mastercard, Discover, JCB American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

*Claim* means:

A.  With respect to Coverage Agreement A (Multimedia Liability) and Coverage Agreement B (Security and Privacy Liability):

    1.  Any written demand for monetary or non-monetary relief made against an *insured*;

    2.  Any civil proceeding or arbitration proceeding initiated against an *insured*, commenced by the service of a summons, complaint or similar pleading or notice; or

    3.  Any written request to toll or waive a statute of limitations relating to a potential *claim* against an *insured*, including any appeal therefrom.

    A *claim* under Coverage Agreement A or Coverage Agreement B will be deemed to be first made when an *insured* first receives notice of any of A(1) through A(3) above.

B.  With respect to Coverage Agreement C (Privacy Regulatory Defense and Penalties), a *government investigation* commenced against an *insured* by letter, notice, complaint or order of investigation. A *claim* under Coverage Agreement C will be deemed to be first made when it is first received by an *insured*.

C.  With respect to Coverage Agreement D (PCI DSS Assessment), a written demand made against an *insured* by an *acquiring bank* or *card association* for a *PCI DSS assessment* due to the *insured's* non-compliance with the *PCI Data Security Standard*. A *claim* under Coverage Agreement D will be deemed to be first made when such written demand is received by an *insured*.

D.  With respect to Coverage Agreement E (Privacy Breach Response Costs, Patient Notification Expenses and Patient Support and Credit Monitoring Expenses), a written report by an *insured* to us of an *adverse media report*, *security breach* or *privacy breach*. A *claim* under Coverage Agreement E will be deemed to be first made when such written report is received by us.

E.  With respect to Coverage Agreement F (Network Asset Protection), a written report by an *insured* to us of a *covered cause of loss*.

F.  With respect to Coverage Agreement G (Cyber Extortion), a written report by an *insured* to us of a *cyber extortion threat*.

G.  With respect to Coverage Agreement H (Cyber Terrorism), a written report by an *insured* to us of an *act of cyber terrorism*.

H.  With respect to Coverage Agreement I (BrandGuard), a written report by an *insured* to us of *brand loss* directly caused by an *adverse media report* or *notification*.

I.  With respect to Coverage Agreement J (Cyber Crime), a written report by an *insured* to us of *financial fraud*, *telecommunications fraud* or a *phishing attack*.

J.  With respect to Coverage Agreement K (Medefense Plus Regulatory Proceeding Coverage), a *regulatory proceeding* commenced against an *insured* by letter, notice, complaint or order of investigation. A *claim* under Coverage Agreement K will be deemed to be first made when it is first received by an *insured*.

*Commercial health insurance payer* means any private health insurance company that primarily arranges for the payment or reimbursement of medical services, items or products. *Commercial health insurance payer* does not include any commercial general liability carrier, workers' compensation carrier, or automobile liability carrier.

*Computer hardware* means the physical components of any *computer system*, including CPU's, memory, storage devices, storage media, input/output devices and other peripheral devices and components, including, but not limited to, cables, connectors, fiber optics, wires, power supply units, keyboards, display monitors and audio speakers.

*Computer program* means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. *Computer program* includes, but is not limited to, communication systems, networking systems, operating systems, and related *computer programs* used to create, maintain process, retrieve, store, and/or transmit electronic *data*.

*Computer system* means interconnected electronic, wireless or web systems, or similar systems (including all *computer hardware* and software) used to process and store *data* or information in an analogue, digital, electronic or wireless format including, but not limited to, *computer programs*, electronic *data*, operating systems, *firmware*, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic *data*), and electronic backup equipment.

*Computer virus* means a program that possesses the ability to create replicas of itself (commonly known as an "auto-reproduction" program) within other programs or operating system areas, and which is capable of spreading copies of itself, wholly or in part, to other *computer systems*.

*Covered cause of loss* means, and is limited to, the following:

A.  Accidental Damage or Destruction
1.  Accidental physical damage or destruction of *electronic media*, so that stored *digital assets* are no longer machine-readable;
2.  Accidental damage or destruction of *computer hardware*, so that stored *data* is no longer machine-readable;
3.  Failure in power supply or under/over voltage, but only if such power supply, including back-up generators, is under *your* direct operational control;
4.  *Programming error* of *delivered programs*; or
5.  Electrostatic build-up and static electricity.

B.  Administrative or Operational Mistakes

An accidental, unintentional, or negligent act, error or omission by an *insured*, a *BPO service provider* or *outsourced IT service provider* in:
1.  The entry, or modification of *your* electronic *data*, which causes damage to such *data*; or
2.  The creation, handling, development, modification or maintenance of *your digital assets*; or
3.  The on-going operation or maintenance of *your computer system*, excluding the design, architecture, or configuration of *your computer system*.

C.  Computer Crime and Computer Attacks

A negligent act, error or omission in the operation of *your computer system* or in the handling of *your digital assets* by an *insured*, a *BPO service provider* or *outsourced IT service provider*, which fails to prevent or hinder any of the following attacks on *your computer system*:
1.  A *denial of service attack*;
2.  *Malicious code*;
3.  *Unauthorized access*; or
4.  *Unauthorized use*.

*Criminal proceeding* means any governmental action for enforcement of criminal laws, including those offenses for which conviction could result in imprisonment and/or criminal fine.

*Cyber extortion expenses* means all reasonable and necessary costs and expenses *you* incur, with our prior written consent, as a direct result of a *cyber extortion threat*, other than *cyber extortion monies*.

*Cyber extortion monies* means any funds or property *you* pay, with our prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a *cyber extortion threat*, in order to terminate such *cyber extortion threat*.

*Cyber extortion threat* means a credible threat or series of related credible threats, including, but not limited to, a demand for *cyber extortion monies*, directed at an *insured* to:

A.  Release, divulge, disseminate, destroy or use the *private information* of a *third party* taken from an *insured* as a result of *unauthorized access* to, or *unauthorized use* of, *your computer system*;
B.  Introduce *malicious code* into *your computer system*;
C.  Corrupt, damage or destroy *your computer system*;
D.  Restrict or hinder access to *your computer system*, including, but not limited to, the threat of a *denial of service attack*; or
E.  Electronically communicate with *your* patients and falsely claim to be *you* or to be acting under *your* direction in order to falsely obtain *private information* of a patient (also known as "pharming," "phishing," or other types of false communications).

*Data* means any and all machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, *private information*, health and medical information, or electronic information subject to back-up procedures, irrespective of the way it is used or rendered.

*Defense costs* means reasonable and necessary legal fees and related costs and expenses incurred in the investigation, defense and appeal of any *claim* under Coverage Agreement A, B, C, D or K. *Defense costs* does not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any *insured* for time spent in cooperating in the defense and investigation of any *claim* or potential *claim* under this Endorsement.

*Delivered programs* means programs, applications, and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

*Denial of service attack* means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a *computer system* by sending an excessive volume of electronic *data* to such *computer system* in order to prevent authorized access to such *computer system*.

*Digital assets* means *data* and *computer programs* that exist in a *computer system*. *Digital assets* do not include *computer hardware*.

*Digital assets loss* means reasonable and necessary expenses and costs *you* incur to replace, recreate or restore *digital assets* to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time. *Digital assets loss* also includes amounts representing employee work time to replace, recreate, or restore *digital assets*, which shall be determined on a predefined billable hours or per hour basis as based upon *your* schedule of employee billable hours.

*Electronic media* means floppy disks, CD ROMs, flash drives, hard drives, solid state drives, magnetic tapes, magnetic discs, or any other media on which electronic *data* is recorded or stored.

*EMTALA proceeding* means any administrative or civil proceedings instituted against an *insured* by a *government entity* alleging violations of the Emergency Medical Treatment and Labor Act (EMTALA).

*Endorsement period* means the period of coverage beginning on the effective date specified on this Endorsement and ending on the earlier of the termination, expiration or cancellation date of the policy to which this Endorsement attaches. *Endorsement period* does not include any extended reporting period.

*Financial fraud* means any of the following:

A.  An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution, directing such institution to debit *your* account and to transfer, pay or deliver *money* or *securities* from *your* account, which instruction purports to have been transmitted by *you* or *your* employee, but was in fact fraudulently transmitted by a *third party* without *your* knowledge or consent;

B.  An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution by *your* employee as a result of that employee receiving intentional, misleading or deceptive telephonic or electronic communications from a *third party* falsely purporting to be *you* or *your* client, vendor or employee, and which directs the financial institution to debit *your* account and to transfer, pay or deliver *money* or *securities* from *your* account; or

C.  The theft of *money* or *securities* from *your* bank account or corporate credit cards by electronic means.

*Financial fraud loss* means *your* loss of *money* or *securities*, which is directly caused by *financial fraud*. *Financial fraud loss* does not include any amounts reimbursed to *you* by any financial institution.

*Firmware* means the fixed programs that internally control basic low-level operations in a device.

*Government entity* means:

A.  Any department, agency, task force or other organization created by any United States federal or state law, regulation, rule or executive order;

B.  Any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the United States federal government or any state government; or

C.  With respect to *billing errors proceedings* only, any organization operating as a Medicare Integrity Program Contractor.

*Government investigation* means a formal investigation instituted against an *insured* by a *government entity*, the subject matter of which is a *privacy breach* or *security breach*.

*HIPAA proceeding* means any administrative or civil proceeding instituted against an *insured* by a *government entity*, the subject matter of which is an *insured's* actual or potential violation of the Health Insurance Portability and Accountability Act (HIPAA) privacy regulations.

*Income loss* means financial loss *you* sustain as determined in accordance with the provisions of Coverage Agreement F.2. or Coverage Agreement H of this Endorsement.

*Insured* means:

A.    An *insured healthcare professional*;
B.    An *insured entity*;
C.    An officer, director, administrator, medical director, or member of any formal accreditation or review board or committee of an *insured entity*;
D.    A volunteer or full-time, part-time, seasonal or temporary employee of an *insured healthcare professional* or *insured entity*, but only while acting within the scope of that person's duties as such; and
E.    A natural person independent contractor, but only while acting within the scope of that person's duties on behalf of an *insured healthcare professional* or *insured entity*.

*Insured entity* means any organization, corporation, partnership, professional association or limited liability company identified on the Declarations Page or on a schedule or endorsement attached to the Policy.

*Insured healthcare professional* means any healthcare professional scheduled individually on the Declarations Page or on a schedule or endorsement attached to the Policy.

*Insured telecommunications system* means any telephone or fax network or system that *you* own, rent, lease, license, or borrow.

*Interruption expenses* means those expenses, excluding *special expenses*, which *you* incur in accordance with the provisions of Coverage Agreement F.2. or Coverage Agreement H of this Endorsement, to:

A.    Avoid or minimize the suspension of *your* business as a result of a total or partial interruption, degradation in service, or failure of *your computer system* caused directly by a *covered cause of loss* or an *act of cyber terrorism*, which *you* would not have incurred had no *covered cause of loss* or *act of cyber terrorism* occurred, including, but not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of *third party* services, or additional staff expenditures or labor costs; and
B.    Minimize or avoid a *covered cause of loss* or an *act of cyber terrorism* and continue *your* business.

The amount of *interruption expenses* recoverable under paragraph A. above shall in no case exceed the amount by which the covered *income loss* is reduced by such incurred expenses.

*Loss* means the amount that an *insured* is legally obligated to pay as a result of a *claim* under Coverage Agreement A or Coverage Agreement B of this Endorsement, including damages and judgments (including prejudgment and post-judgment interest awarded against an *insured* on that part of any judgment paid or to be paid by us), legal fees and costs awarded pursuant to such judgments, and settlements negotiated with our consent.

*Loss* does not include:

A.    Taxes;
B.    Any amount which an *insured* is not legally obligated pay;
C.    Amounts owed under contract;
D.    An *insured's* future profits or royalties or any return, withdrawal, restitution or reduction of an *insured's* professional fees, profits or other charges;
E.    Punitive, liquidated or exemplary damages or the multiplied portion of multiplied damages;
F.    Fines, sanctions or penalties;
G.    Any matters that are deemed uninsurable under applicable law;
H.    The costs to comply with orders granting injunctive or non-monetary relief, including specific performance or any agreement to provide such relief;
I.    Disgorgement of any remuneration or financial advantage to which *you* were not legally entitled; or
J.    Settlements negotiated without our consent.

*Malicious code* means software intentionally designed to insert itself into and damage a *computer system* without the owner's informed consent by a variety of forms including, but not limited to, viruses, worms, Trojan horses, spyware, dishonest adware, and crimeware.

*Money* means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including, but not limited to, currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

*Multimedia peril* means the release of, or display of, any *electronic media* on *your* internet site or *print media* for which *you* are responsible, which directly results in any of the following:

A.  Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement or trade libel;
B.  Invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person or likeness, or public disclosure of private facts;
C.  Plagiarism, piracy or misappropriation of ideas under an implied contract;
D.  Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or
E.  Domain name infringement, improper deep linking, or framing.

*Notification* means written notice to affected individuals in the event of a *security breach* or a *privacy breach*.

*Operational programs* means programs and software that are ready for operational use, having been fully developed, tested, and accepted by an *insured*.

*Other property* means any tangible property, other than *money* or *securities*, which has intrinsic value.

*Outsourced IT service provider* means a *third party* independent contractor that provides information technology services for *your* benefit, under a written contract with *you* to provide such services. *Outsourced IT service provider* services include, but are not limited to, hosting, security management, co-location, and *data* storage.

*Patient notification expenses* means:

A.  Those reasonable and necessary legal expenses, computer forensic and investigation expenses, *public relations expenses*, postage expenses and related advertising expenses incurred by an *insured*, with our prior written consent, to comply with governmental privacy legislation mandating notice to affected individuals in the event of a *security breach* or *privacy breach*; and
B.  *Voluntary notification expenses* incurred with our prior written consent, subject to the *voluntary notification expenses sublimit*.

*Patient support and credit monitoring expenses* means those reasonable and necessary expenses *you* incur, with our prior written consent, in the event of a *privacy breach*, for the provision of support activity, including the provision of credit file monitoring services and identity theft education and assistance for up to a period of twelve (12) months from the date of enrollment in such services.

*PCI Data Security Standard* (known as "PCI DSS") means the data security standards published by the Payment Card Industry Security Standards Council, in effect now or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder *data*.

*PCI DSS assessment* means a monetary fine or penalty assessed against an *insured* by an *acquiring bank* or *card association* as a result of a *security breach* or *privacy breach*.

*Period of indemnity* means the period beginning with the earlier of the date of *notification* or the first publication of an *adverse media report* (whichever applies), and ending on the earlier of:

A.  The date that gross revenues are restored to the level they had been prior to *notification* or the first *adverse media report* (whichever applies); or
B.  One hundred eighty (180) consecutive days after the notice of *brand loss* is received by us.

*Period of restoration* means the period of time beginning on the date when the interruption, degradation or failure of *your computer system* began and ending on the earlier of:

A.  The date when *your computer system* is restored or could have been repaired or restored to the same condition, functionality, and level of service that existed prior to the *covered caused of loss* or the *act of cyber terrorism* with reasonable diligence, plus up to thirty (30) additional consecutive days after the restoration of *your computer system* to allow for restoration of *your* business; or
B.  One hundred twenty (120) consecutive days after the notice of *covered cause of loss* or *act of cyber terrorism* is received by us.

*Personally identifiable information* means information that can be used to determine, distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual.

*Phishing attack* means the use of fraudulent electronic communications or malicious websites to impersonate *you*, *your* brand, or any of *your* products or services, in order to solicit *private information*.

*Phishing attack loss* means:

A.  Expenses *you* incur, with our prior written consent, to create and issue a specific press release or to establish a specific website to advise *your* patients or prospective patients of a *phishing attack*; and
B.  The cost of reimbursing *your* existing patients for their losses arising directly from a *phishing attack*.

*Print media* means newspapers, newsletters, magazines, brochures, books and literary works in any form, or other types of publications and advertising materials, including packaging, photographs, and digital images.

*Privacy breach* means any of the below, whether actual or alleged, but only if committed or allegedly committed by an *insured* or by others acting on *your* behalf for whom *you* are legally responsible, including *BPO service providers* and *outsourced IT service providers*:

A.  A common law breach of confidentiality, invasion, infringement, interference, or violation of any right to privacy, including, but not limited to, a breach of *your* privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion, failure to properly handle, manage, store, destroy or otherwise control a person's *private information* in any format, or the intrusion or misappropriation of a person's name or likeness for commercial gain; or
B.  Any breach or violation of U.S. federal, state or local privacy statutes or regulations, as they currently exist and as amended, associated with confidentiality, access, control, and use of *personally identifiable information*, including, but not limited to:

   1.  The Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) (HIPAA) (Pub. L. 104-191), including Title II which requires protection of confidentiality and security of electronic protected health information, and the rules and regulations promulgated thereunder as they currently exist and as amended, including related state medical privacy laws, as they currently exist and as amended;
   2.  The Gramm-Leach-Bliley Act of 1999 (GLBA), also known as the Financial Services Modernization Act of 1999 (Pub. L. 106-102), including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder, as they currently exist and as amended;
   3.  The State Attorneys General and the Federal Trade Commission's enforcement actions regarding security and privacy of consumer information;
   4.  Governmental privacy protection regulations or laws, as they currently exist now or in the future, which require commercial internet sites or on-line services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or *data* theft, abuse or misuse;
   5.  Federal and state consumer credit reporting laws, such as the Federal Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) (FCRA);
   6.  The EU Data Protection Directive or other similar privacy laws worldwide; or
   7.  The Health Information Technology for Economic and Clinical Health Act (HITECH Act) enacted under Title XIII of the American Recovery and Reinvestment Act (ARRA) of 2009 (Pub. L. 111-5).

A series of continuing *privacy breaches*, related or repeated *privacy breaches*, or multiple *privacy breaches* resulting from the same facts or circumstances shall be considered a single *privacy breach* and shall be deemed to have occurred at the time the first of such *privacy breaches* occurred.

*Privacy breach response costs* means:

A.  Those reasonable and necessary fees and expenses *you* incur, with our prior written consent, for the employment of a public relations consultant, if action is reasonably necessary to avert or mitigate any material damage to *your reputation* or brands, which results or reasonably will result from an *adverse media report*; and
B.  *Proactive privacy breach response costs* incurred with our prior written consent, subject to the *proactive privacy breach response costs sublimit*.

*Private information* means:

A.  Proprietary or confidential information owned by a *third party* that is in the care, custody or control of an *insured* or is used by an *insured* with the consent of such *third party*;
B.  *Personally identifiable information*; and
C.  Any information that is linked or linkable to a specific individual and that is subject to any privacy regulations.

*Proactive privacy breach response costs* means those reasonable and necessary *public relations expenses you* incur in response to an actual or potential *security breach* or *privacy breach*, but prior to the publication of an *adverse media report*, in an effort to avert or mitigate the potential impact of an *adverse media report*. *Proactive privacy breach response costs* must be incurred with our prior written consent.

*Proactive privacy breach response costs sublimit* means the maximum amount that we will pay for *proactive privacy breach response costs*. The *proactive privacy breach response costs sublimit* is included within, and will erode, the limits of liability applicable to Coverage Agreement E of this Endorsement.

*Programming error* means an error that occurs during the development or encoding of a *computer program*, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a *computer system*.

*Property damage* means injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured. *Data* is not considered tangible property.

*Public relations expenses* means reasonable and necessary expenses *you* incur to re-establish *your reputation* which was damaged as a direct result of an *adverse media report*.

*Qui tam action* means civil proceedings brought against an *insured* by a *qui tam plaintiff* as a relator for a *government entity*.

*Qui tam plaintiff* means a private plaintiff under the False Claims Act or any equivalent state law.

*Regulatory compensatory award* means a sum of *money* an *insured* is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a *third party*, due to an adverse judgment or settlement arising out of a *government investigation*. *Regulatory compensatory award* does not include any criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

*Regulatory fines and penalties* means those amounts specifically designated by a *government entity* as civil or administrative fines and penalties, which an *insured* is legally obligated to pay as a result of a *government investigation* or *regulatory proceeding*.

*Regulatory fines and penalties* does not include:

A.    Any criminal fines or penalties of any nature whatsoever;
B.    Any fines or penalties imposed against an *insured* for failure to comply with or follow the *PCI Data Security Standard* or any payment card company rules; or
C.    Any interest assessed on *regulatory fines and penalties*.

*Regulatory proceeding* means, and is limited to, any of the following instituted against an *insured*:

A.    A *billing errors proceeding*,
B.    An *EMTALA proceeding*,
C.    A *Stark proceeding*, or
D.    A *HIPAA proceeding*.

A *regulatory proceeding* will be deemed to be instituted when an *insured* receives formal written notice of any of the foregoing.

*Restitution* means repayment of fees, reimbursements, profits, charges or other benefit payments that are received by an *insured* from a governmental health benefit payer or program, or a carrier or intermediary making payments as part of, or in connection with, any such program, or a *commercial health insurance payer*, or any patient, to which such *insured* was not legally entitled by reason of a *billing error*, the return of which is sought in a *billing errors proceeding*.

*Security* or *Securities* means negotiable or non-negotiable instruments or contracts representing *money* or *other property*, but does not include *money*.

*Security and privacy wrongful act* means any of the following acts, whether actual or alleged, but only if committed or alleged committed by an *insured*:

A.    The failure to prevent or hinder a *security breach*, which in turn results in:

1.    The alteration, copying, corruption, destruction or deletion of, or damage to, electronic *data* stored on *your computer system*;
2.    Theft, loss or unauthorized disclosure of electronic or non-electronic *private information* that is in an *insured's* care, custody or control;
3.    Theft, loss or unauthorized disclosure of electronic or non-electronic *private information* that is in the care, custody or control of a *BPO service provider* or *outsourced IT service provider* that is holding, processing or transferring such *private information* on *your* behalf; provided, however, that the theft, loss or unauthorized

disclosure occurs while *your* written contract with such *BPO service provider* or *outsourced IT service provider* is in effect; or

    4.    *Unauthorized use* of or *unauthorized access* to a *computer system* other than *your computer system*;

B.    The failure to timely disclose a *security breach* affecting *personally identifiable information*, or the failure to dispose of *personally identifiable information* within the required time period, in violation of privacy regulations in effect now or in the future;

C.    The failure to prevent the transmission of *malicious code* or *computer virus* from *your computer system* to the *computer system* of a *third party*;

D.    A *privacy breach*;

E.    The failure to prevent or hinder participation by *your computer system* in a *denial of service attack* directed against internet sites or the *computer system* of any *third party*; or

F.    Loss of *your* employee's *personally identifiable information*.

*Security breach* means any of the following, whether a specifically targeted attack or a generally distributed attack:

A.    *Unauthorized access* to, or *unauthorized use* of, *your computer system*, including *unauthorized access* or *unauthorized use* resulting from the theft of a password from *your computer system* or from an *insured*;

B.    A *denial of service attack* against *your computer system*; or

C.    Infection of *your computer system* by *malicious code* or the transmission of *malicious code* from *your computer system*.

A series of continuing *security breaches*, related or repeated *security breaches*, or multiple *security breaches* resulting from a continuing failure of computer security shall be considered a single *security breach* and shall be deemed to have occurred at the time the first of such *security breaches* occurred.

*Shadow audit* means an audit performed by a qualified professional, which examines the same billing records and related documents as those subject to an ongoing *billing errors proceeding*, with the intent of providing an *insured* with a private expert opinion. Such *shadow audits* are subject to our prior approval.

*Shadow audit expenses* means the fees for the services of a qualified audit professional and associated expenses incurred by an *insured* in the course of a *shadow audit*.

*Special expenses* means reasonable and necessary costs and expenses *you* incur to:

A.    Prevent, preserve, minimize, or mitigate any further damage to *your digital assets*, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts;

B.    Preserve critical evidence of any criminal or malicious wrongdoing;

C.    Purchase replacement licenses for *computer programs* because the copy protection system or access control software was damaged or destroyed by a *covered cause of loss* or an *act of cyber terrorism*; or

D.    Notify *your* patients of a total or partial interruption, degradation in service, or failure of *your computer system* resulting from a *covered cause of loss* or *act of cyber terrorism*.

*Stark proceeding* means administrative or civil proceedings instituted against an *insured* by a *government entity* alleging violation of any federal, state or local anti-kickback or self-referral laws by an *insured*. *Stark proceeding* does not include:

A.    A *criminal proceeding*; or

B.    A subpoena for records, testimony, or other documentation which does not allege a violation of any federal, state or local anti-kickback law or self-referral laws by an *insured*.

*Telecommunications fraud* means the intentional, unauthorized and fraudulent gaining of access to outgoing telephone service through infiltration and manipulation of an *insured telecommunications system*.

*Telecommunications fraud loss* means the charges *you* incur for unauthorized calls directly resulting from *telecommunications fraud*.

*Third party* means any entity, company, organization or person who does not qualify as an *insured*.

*Unauthorized access* means the gaining of access to a *computer system* by an unauthorized person or persons.

*Unauthorized use* means the use of a *computer system* by unauthorized persons or by authorized persons in an unauthorized manner.

*Voluntary notification* means written notice to any individual of a *privacy breach* or *security breach* where there is no specific legal requirement in the applicable jurisdiction mandating such notice.

*Voluntary notification expenses sublimit* means the maximum amount that we will pay for *patient notification expenses* incurred as a result of *voluntary notification*. The *voluntary notification expenses sublimit* is included within, and will erode, the limits of liability applicable to Coverage Agreement E of this Endorsement.

*Voluntary self-disclosure* means an *insured* discloses information, without inquiry, to any *government entity* or *commercial health insurance payer*, which may serve as grounds for a *regulatory proceeding* against such *insured*. Such information must have become known to the *insured* fortuitously and subsequent to the original inception date of this Cyber Solutions /Medefense Plus insurance.

*Waiting period* means:

A.    With respect to Coverage Agreement F.2. and Coverage Agreement H of this Endorsement, the 8-hour period which must elapse before *income loss, interruption expenses* and *special expenses* may be payable. The *waiting period* applies to each *period of restoration*.

B.    With respect to Coverage Agreement I of this Endorsement, the two-week period which must elapse after *notification*, or in the event of an *adverse media report*, after publication of the first *adverse media report*, before *brand loss* may be payable. The *waiting period* applies to each *period of indemnity*.

*Wrongful act* means:

A.    A *billing error*; or

B.    An act, error or omission that gives rise to an *EMTALA proceeding*, *Stark proceeding* or *HIPAA proceeding*.

*You* and *your* means any *insured healthcare professional* or *insured entity*.

*Your computer system* means:

A.    A *computer system* operated by and owned by, or leased to, *you*;

B.    With respect to Coverage Agreement B (Security and Privacy Liability) only, a *computer system* operated by a *BPO service provider* or *outsourced IT service provider* and used for the sole purpose of providing hosted computer application services to *you* or for processing, maintaining, hosting, or storing *your* electronic *data*, pursuant to a written contract with *you* to provide such services.

*Your reputation* means the estimation of trust that patients, customers or clients have in doing business with *you* or in purchasing *your* products or services.

_____                    _____
Authorized Representative                    Authorized Representative



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4380, f. 801.531.0381
UMIA.com

## Separate Defense Cost Limit for Cyber Solutions® and Medefense® Plus

The Cyber Solutions®/Medefense® Plus Endorsement is amended as follows:

The following Separate Defense Costs Limit provision is added and supersedes any other provisions to the contrary.

It is understood and agreed that the Cyber Solutions/Medefense Plus Endorsement provides a separate *defense costs* limit as follows:

1. **Cyber Solutions/Medefense Plus** *Defense Costs Limit*

   $50,000 each *claim* and in the aggregate, each *insured entity* and *insured healthcare professional*

2. **Annual Aggregate** *Defense Costs Limit*
   (all *insureds* and all Coverage Agreements combined; aggregate based on the size of the group as of the effective date of the Cyber Solutions/Medefense Plus Endorsement):

   | | |
   |---|---|
   | 0-1 Physician: | $ 50,000 aggregate |
   | 2-10 Physicians: | $100,000 aggregate |
   | 11-20 Physicians: | $150,000 aggregate |
   | 21+ Physicians: | $250,000 aggregate |

*Defense costs* shall first be applied to the applicable *defense costs* limit set forth above. Any covered *defense costs* that exceed the applicable *defense costs* limit will be applied to, and may completely exhaust, the applicable limits set forth in the Cyber Solutions/Medefense Plus Schedule of Limits ("the Schedule"). If the Combined Annual Aggregate Limit set forth in Item 3 of the Schedule is exhausted, the *defense costs* limit shall also be deemed exhausted, no further *defense costs* will be paid, and our obligations under the Cyber Solutions/Medefense Plus Endorsement shall be deemed completely fulfilled and extinguished.

All other terms, conditions and exclusions of the Cyber Solutions/Medefense Plus Endorsement and your policy remain the same.


_____
Authorized Representative



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4380, f. 801.531.0381
UMIA.com

## Non-Stacking of Limits for Cyber Solutions®

The Cyber Solutions® Endorsement is amended to include the following clause:

### NON-STACKING OF LIMITS

In the event any *claim* is covered, in whole or in part, under this Cyber Solutions Endorsement and any other Cyber Solutions Endorsement issued by us, then the most we will pay for such *claim* shall be the single largest applicable Limit of Liability available under any one of those Endorsements. In no event shall this condition be construed to increase the Limits of Liability set forth in the Cyber Solutions Schedule of Limits.

All other terms, conditions and exclusions of the Cyber Solutions Endorsement and your policy remain the same.

Authorized Representative



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4380, f. 801.531.0381
UMIA.com

## Patient Medical Expense Coverage Endorsement – Claims-Made

The Medical Professional Liability Insurance is amended as follows:

SECTION FOUR- DEFINITIONS is amended to include:

*Medical expenses* means the reasonable and necessary out of pocket expenses incurred by a patient for medical care. *Medical expenses* do not include any expenses charged by an *insured*.

SECTION EIGHT- ADDITIONAL BENEFITS is amended to include:

PATIENT MEDICAL EXPENSE COVERAGE

We will reimburse a patient for *medical expenses* as a result of *professional services* that result in an unanticipated injury or outcome.

1.  To fall within this coverage, the following requirements must be met:
    (a).  We must receive a written request from the *policyholder* to reimburse the *medical expenses*,
    (b).  The *professional services* must have been provided during the policy period,
    (c).  The request must be received by us during the *policy period*,
    (d).  The *medical expenses* must be incurred within one year of the *professional service* being provided, and
    (e).  There is not a *claim* for *damages*.

2.  Limit
    (a).  The Each Patient Medical Expense Limit is the most we will pay as reimbursement for *medical expenses* incurred by one patient
    (b).  The Aggregate Medical Expense Limit is the most we will pay as reimbursement for *medical expenses* incurred by all patients
    (c).  These limits apply in addition to the limits of liability stated on the Declarations page

All other terms, conditions and exclusions of the Cyber Solutions Endorsement and your policy remain the same.

_Julie Stafford_
Authorized Representative



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4380, f. 801.531.0381
UMIA.com

## Montana Amendatory Endorsement

The Common Conditions of the policy are amended as follows:

Paragraph B.   CANCELLATION sub paragraph 2. Cancellation by us is deleted and replaced with the following:

2.      Cancellation by us

A.      If this policy has been in effect for less than 60 days and has not been renewed, we can cancel this policy by providing written notice to the *policyholder* at the address shown in the Declarations or endorsement to this policy:

(i).      10 days before the effective date of cancellation, if we cancel for non-payment of premium; or

(ii).     60 days before the effective date of the cancellation, if we cancel for any other reason.

B.      If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may only cancel this policy, for one of the following reasons:

(i).      10 days before the effective date of cancellation, if we cancel for non-payment of premium;

(ii).     60 days before the effective date of the cancellation, if we cancel for any of the following reasons:

(1).     material misrepresentation;

(2).     substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk when the policy was written;

(3).     any substantial breach of any contractual duty, condition, or warranty;

(4).     determination by the Montana Commissioner of Insurance that continuation of the policy would place us in violation of any Montana law;

(5).     financial impairment of us; or

(6).     any other reason approved by the Montana Commissioner of Insurance and Securities.

The following condition is added:

CONFORMITY TO LAW

The provisions of the policy conform to the minimum requirements of Montana law and control over any conflicting statues of any state in which the *insured* resides on or after the effective date of the policy.

*INCLUDED WHEN CLAIMS-MADE MEDICAL PROFESSIONAL LIABILITY IS INCLUDED IN THE POLICY*

[The Medical Professional Liability Insurance is amended as follows:

SECTION NINE - EXTENDED REPORTING PERIOD is amended as follows:

Paragraph C. OPTIONAL EXTENDED REPORTING PERIOD is deleted and replaced with the following:

C.      OPTIONAL EXTENDED REPORTING PERIOD

If this insurance is non-renewed or cancelled for any reason other than non-payment of premium, the *policyholder* has the right to purchase an *extended reporting period* that would apply to all *insureds*. If the coverage provided by this insurance ends for any *individual insured*, the *individual insured* has the right to purchase an *extended reporting period*.

This *extended reporting period* will be provided by an endorsement we issue for an additional premium. The right to purchase an *extended reporting period* must be exercised within 30 days of the termination of coverage by providing:

1.      Written notice to us, and

2.      Payment of the premium when due.



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4300, f. 801.531.0381
UMIA.com

We will determine the duration of, and the premium for, the *extended reporting period* in accordance with the rules and rates in place on the effective date of the *extended reporting period*. The premium for the *extended reporting period* must be paid within 30 days of the date the coverage is terminated. ]

*INCLUDED WHEN CLAIMS-MADE GENERAL LIABILITY IS INCLUDED IN THE POLICY*

[The General Liability Insurance is amended as follows:

SECTION NINE - EXTENDED REPORTING PERIOD is amended as follows:

Paragraph C. OPTIONAL EXTENDED REPORTING PERIOD is deleted and replaced with the following:

C.    OPTIONAL EXTENDED REPORTING PERIOD

If this insurance is non-renewed or cancelled for any reason other than non-payment of premium, the *policyholder* has the right to purchase an *extended reporting period* that would apply to all *insureds*.

This *extended reporting period* will be provided by an endorsement we issue for an additional premium. The right to purchase an *extended reporting period* must be exercised within 30 days of the termination of coverage by providing:

1.    Written notice to us, and
2.    Payment of the premium when due.

We will determine the duration of, and the premium for, the *extended reporting period* in accordance with the rules and rates in place on the effective date of the *extended reporting period*. The premium for the *extended reporting period* must be paid within 30 days of the date the coverage is terminated.]

*INCLUDED WHEN EMPLOYEE BENEFTIS ADMINISTRATION LIABILITY IS INCLUDED IN THE POLICY*

[The Employee Benefits Administration Liability Insurance is amended as follows:

SECTION EIGHT - EXTENDED REPORTING PERIOD is amended as follows:

Paragraph C. OPTIONAL EXTENDED REPORTING PERIOD is deleted and replaced with the following:

C.    OPTIONAL EXTENDED REPORTING PERIOD

If this insurance is non-renewed or cancelled for any reason other than non-payment of premium, the *policyholder* has the right to purchase an *extended reporting period* that would apply to all *insureds*.

This *extended reporting period* will be provided by an endorsement we issue for an additional premium. The right to purchase an *extended reporting period* must be exercised within 30 days of the termination of coverage by providing:

1.    Written notice to us, and
2.    Payment of the premium when due.

We will determine the duration of, and the premium for, the *extended reporting period* in accordance with the rules and rates in place on the effective date of the *extended reporting period*. The premium for the *extended reporting period* must be paid within 30 days of the date the coverage is terminated. ]

Authorized Representative



310 East 4500 South, Suite 600
Salt Lake City, Utah 84107-3993
p. 800.748.4380, f. 801.531.0381
UMIA.com

## COMMON CONDITIONS

In this policy the words we, our or us refer to the insurance company identified in the Declarations. The words you or your refer to the *policyholder* identified in the Declarations. The meaning of words or phrases bolded and italicized are found in the definition sections of your policy.

A.  APPLICATION

By accepting this policy the *policyholder,* on behalf of all *insureds,* agrees that:

1.  All of the information and statements made in the application for this policy or any applicable underlying policy are accurate and complete,
2.  We issued this policy in reliance on the accuracy and completeness of the representations,
3.  The applications are part of this policy, and
4.  A misrepresentation or omission of material information will render this policy void.

B.  CANCELLATION

1.  Cancellation by the *policyholder*
    The *policyholder* can cancel this policy at any time. For the cancellation to be effective, the *policyholder* must mail a written notice to us, advising us of the effective date of the cancellation and ensure that we receive the notice before the requested termination date.

2.  Cancellation by us
    We can cancel this policy by providing written notice to the *policyholder* at the address shown in the Declarations or endorsement to this policy:

    (a).  10 days before the effective date of cancellation, if we cancel for non-payment of premium, or
    (b).  60 days before the effective date of the cancellation, if we cancel for any other reason.

3.  The cancellation will be effective and the policy will end on the date and time shown on the notice.

4.  If we cancel this policy, any refund of premium will be pro rata. If the *policyholder* cancels this policy, earned premium will be computed under the customary short-rate tables and procedures.

5.  Premium adjustments may be made either on the effective date of the cancellation or as soon as practicable after the cancellation becomes effective. The effectiveness of the cancellation is not dependent on the payment date of any unearned premium period.

6.  Proof of mailing to the address shown in the Declarations or endorsement will be sufficient proof of notice. Delivery to us or to the *policyholder* at the address shown in the Declarations or endorsement is the equivalent of mailing.

C.  CHANGES

The provisions of this policy cannot be altered, modified or waived except through a written endorsement issued by us and attached to this policy.

D.  COMPLIANCE

This policy will be interpreted under that state law where it is delivered. The terms of this policy will be automatically amended to comply with the requirements of controlling state law.

E.  CONCEALMENT, MISREPRESENTATION AND FRAUD

No coverage is provided to any *insured* who conceals or misrepresents a fact or circumstance concerning:

1.  Any application,
2.  This policy, or
3.  Any *claim*.

F.  **GOVERNMENT ACCESS TO RECORDS**

In order to comply with the requirements of sections 952 of the omnibus reconciliation act of 1980, it is agreed that, upon written request, we will allow the secretary of Health and Human Services and the comptroller general access to the policy and necessary books, documents and records to verify the cost of the policy, to the extent required by law. The access described in this paragraph will be provided for up to four years after the termination date of this policy.

G.  **IMMUNITY AND TORT CAPS**

By accepting coverage under this policy, *insureds* are not waiving their statutory immunities or tort liability damage caps. We will not be liable for *damages* in excess of statutory monetary limits or tort liability damage caps unless the limitation is found by a court not to apply.

H.  **INSPECTIONS AND SURVEYS**

1.  We have the right, but are not obligated to:

    (a).  Review the *insured's* books and records,
    (b).  Inspect the *insured's* premises, and
    (c).  Conduct other risk control or risk prevention activities.

2.  Any inspections, surveys, reports or recommendations are for risk management purposes only. We do not warrant the safety of the *insured's* premises or the quality of the *insured's* services.

I.  **LIMITATION OF LEGAL ACTION**

No legal action may be brought against us unless there has been full compliance by the *insured* with all of the terms and conditions of this policy. We cannot be named in any legal action unless and until the *damages* the *insured* is legally required to pay have been determined by a judgment following an actual trial or by written agreement among the claimant, the *insured* and us.

J.  **PARTICIPATION**

This policy is a participation policy to the extent that the *policyholder* may be entitled to receive a distribution. Distributions will be made at the discretion of our Board of Directors and are subject to any terms the Board of Directors and applicable law may impose.

K.  **PREMIUM**

Premiums for this policy are payable to us or an agent authorized by us to receive payment. The premium must be paid prior to the inception date of the policy or when otherwise due. Any additional premium that is assessed due to a change in the policy while it is in effect is payable to us or an agent before the change goes into effect or when otherwise due.

L.  **RIGHTS AND OBLIGATIONS OF THE POLICYHOLDER**

It is agreed that the *policyholder* has the right and obligation to act on behalf of all other *insureds* in:

1.  Requesting and agreeing to changes to the policy,
2.  Requesting cancellation and receiving our notice of cancellation,
3.  Paying the premium and receiving any refund,
4.  Maintaining and providing the documents and information we request in order to establish the premium or investigate or defend a *claim*, and
5.  Paying the deductible on behalf of any *insured*.

M.  **THE INSURED'S OBLIGATIONS**

1.  The *insured* must fully cooperate with us in the investigation of *claims*, the negotiation of settlements, and the conduct of litigation. The *insured* is obligated to attend hearings and trials and assist in the presentation of evidence. The *insured* must also cooperate with us in pursuing any right of contribution or subrogation against a person or organization that is or may be liable to the *insured*. The *insured* will make any assignment necessary to assist in enforcing any right to contribution or subrogation.

2.  The *insured* must not, except at the *insured's* own expense, make any payment, admit any liability or incur any obligation other than reasonable medical expenses.

N.    TRANSFER OF INTEREST

   The *insured* cannot transfer or assign this policy.


_Authorized Representative_