IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UMIA INSURANCE, INC., | CV 20-177-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| ENRICO F. ARGUELLES, ARTHRITIS & OSTEOPOROSIS CENTER PC, DONNA FRYER, BROOKLYN T. BLACK, BARBARA DAVISON, LORA SMITH, JULIE LORTZ and STEVE LORTZ, | |
| Defendants. | |

Plaintiff UMIA Insurance, Inc. ("UMIA") brought this action against

Defendants Enrico F. Arguelles, M.D. and his clinic, Arthritis & Osteoporosis

Center PC ("AOC") (collectively "Arguelles"), seeking declaratory judgment in

relation to claims brought by Donna Fryer, Brooklyn T. Black, Barbara Davison,

Lora Smith, and Julie and Steve Lortz ("Underlying Claimants") against

Arguelles.[1]  (Doc. 1.)  In response, Arguelles brought a Counterclaim against

UMIA, asserting claims for breach of contract, violation of Montana's Unfair

---

[1] Since the filing of this action, Defendants Fryer, Black, Smith, Davison, and Lortz have been dismissed pursuant to settlements of all the Underlying Lawsuits.  *See* Docs. 13-14 (Unopposed Motion to Dismiss Lortz); 25-26 (Stipulation to Dismiss Fryer and Davison); 52, 52-1 (acknowledging settlement of the Black lawsuit); 60-61 (Stipulation to Dismiss Smith).

Trade Practices Act ("UTPA"), declaratory relief, and punitive damages.[2]  (Doc. 20.)

Presently before the Court are UMIA's Motion for Summary Judgment as to Arguelles' counterclaims (Doc. 141), and Arguelles's Cross-Motion for Summary Judgment as to the counterclaims (Doc. 160).[3]  The motions are fully briefed and ripe for review.

Having considered the parties' submissions, the Court finds both UMIA's motion (Doc. 141), and Arguelles's motion (Doc. 160) should be **DENIED**.

## I.    Factual Background[4]

Arguelles was the president and director of AOC in Billings, Montana. Arguelles provided treatment to patients with autoimmune and joint diseases, including rheumatoid arthritis.  Between 2009 and 2017, Defendants Fryer, Smith, and Davison were patients of Dr. Arguelles.  (Doc. 143-1 at 582, 659, 1164-65.) These patients each filed lawsuits against Arguelles, asserting claims for medical malpractice and fraud for allegedly engaging in a pattern of improperly diagnosing

---

[2] Previously, the Court granted UMIA's motion for partial summary judgment on Arguelles's counterclaim for abuse of process.  (Doc. 69.)  Further the counterclaim for declaratory judgment is moot in light of the settlement of the Underlying Actions.

[3] UMIA has also filed a Motion to Consolidate Cases (Doc. 173), which will be addressed by separate order.

[4] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

rheumatoid arthritis, and for providing unnecessary medical treatment to increase profits (the "Underlying Lawsuits" or "Underlying Claims").  (Doc. 143-1 at 576, 653, 1160, 1134, 1147.)

At all times relevant to the Underlying Lawsuits, Arguelles and AOC were each insured under UMIA professional liability policies.  (Doc. 143-1 at 283-427.) From January 1, 2017 to January 1, 2018, Arguelles was covered under policy number MT30713[5] and AOC under policy number MT 200018[6] (the "2017 Policies").  The 2017 Policies contained the following exclusions:

---

[5] The 2017 Arguelles Policy contained the following insuring agreement:
> A claim must meet two requirements to be covered under this section:
> > (1) The claim must result from medical service which was provided or which should have been provided on or after the retroactive date stated on your Declarations Sheet: and
> > (2) The claim must be made for the first time during the policy period. A claim or potential claim reported to a previous insurer is not covered under this section.
> > . . .
> We will pay on your behalf damages you are legally obligated to pay resulting from:
> > (1) The medical services which you personally provided or should have provided to your patients.
> > (2) The medical services provided, or which should have been provided, by others for whom you are legally responsible, except for:
> > > (a) Physician assistants, certified registered nurse anesthetists, certified registered nurse midwives, certified registered nurse practitioners and per fusionists unless they are named in an endorsement and the required premium for them is paid; and (b) A physician you employee unless her or she is covered for the claim by another professional liability policy;
> > > (3) Your professional service on a formal medical accreditation board or any committee responsible for making decisions regarding credentials, privileges or quality assurance matters.

(Doc. 143-1 at 295.)

[66] The AOC Policy contained the following insuring agreement:

3

> **Exclusion for violation of law.** We will not cover any claims resulting from your acts which are in violation of any law, statute, ordinance or regulation.
>
> . . .
>
> **Exclusion for punitive or exemplary damages.** We will not pay any punitive or exemplary damages. We will defend you, however, against any claim for such damages as long as they result from a claim for damages otherwise covered by this section.

(*Id.* at 296-97, 332-33.)   From January 1, 2018 to January 1, 2019, Arguelles was covered under policy number MT307713 and AOC under policy number MT 200018 (the "2018 Policies").[7]  The 2018 Policies contained the following exclusions:

---

> 1) The claim must result from medical service which was provided or which should have been provided by your employees while acting in the course and scope of their employment on or after the retroactive date stated on your Declarations Sheet; and (2) The claim must be made for the first time during the policy period. A claim or potential claim reported to a previous insurer is not covered under this section.
> . . .
> We will pay on your behalf damages you are legally obligated to pay resulting from medical services provided, or which should have been provided, by your employees while they are acting in the course and scope of their employment.
> You and your employees share your limits of coverage.

(Doc. 143-1 at 330.)

[7] The 2018 Policies contained the following insuring agreement:
> A. We will pay *damages* an *insured* is legally required to pay as a result of a *medical incident* that happens on or after the applicable *prior acts date* and before the expiration date of this insurance. To fall within this insuring agreement the claim must be first made against the *insured* and reported to us during the *policy period* or any applicable *extended reporting period*.
> . . .
>
> B. *Damages* means amounts that an *insured* is legally obligated to pay to compensate another for injury or damage resulting from a *medical incident*.

### C. CRIMINAL OR KNOWINGLY WRONGFUL ACTS

This insurance does not apply to any *claim* arising out of a criminal, willful, malicious, fraudulent, dishonest or knowingly wrongful act committed by or with the knowledge of the *insured*.
. . .

### H. VIOLATION OF LAW

This insurance does not apply to any *claim* arising out of the violation of any local, state or federal statute, rule or regulation.

(*Id.* at 342-43; 392-93.)

Prior to the filing of the Underlying Lawsuits, the United States Department of Justice (DOJ) issued a subpoena to Arguelles and AOC on April 13, 2015. (*Id.* at 3-6.) The subpoena requested patient health records of thirty patients who were treated at AOC between January 1, 2010 and December 31, 2013. The DOJ sought the records to investigate federal health care offenses as defined in 18 U.S.C. § 24(a), violations or conspiracies to violate 18 U.S.C. s 669, 1035, 1347, or 1518, or 18 U.S.C. §§ 287, 371, 664, 1001, 1027, 1341, or 1954 if the violation related to a healthcare benefit program (defined in 18 U.S.C. § 24(b)). Arguelles tendered the subpoena to UMIA, who reimbursed him for the costs of responding. (Doc. 143-1 at 30.)

On May 5, 2017, Fryer filed an Application for Review of Claim with the Montana Medical Legal Panel ("MMLP"). (*Id.* at 110-13.) Arguelles tendered

---

(Doc. 143-1 at 342-43; 392-93.)

defense of the claim to UMIA, and UMIA retained Attorney Gary Kalkstein

("Kalkstein") to defend Arguelles.  (*Id.* at 35, 125.)  On January 31, 2018, Davison

filed an MMLP Application, and on March 8, 2019, Smith filed a MMLP

Application.  (*Id.* 260-70.)  UMIA again retained Kalkstein to defend Arguelles on

both claims, as well as claims filed by Lortz and Black.  (*Id.* at 35, 125.)

The 2017 Policies were triggered by the Fryer claim because it was first

reported to UMIA during the 2017 policy period.  The 2018 Policies were

triggered by the Davison, Smith, Lortz, and Black claims because they were first

reported during the 2018 policy period, or within the Extended Reporting Period

Endorsement.

On May 3, 2017, Kalkstein sent an email to UMIA representative Kim Day,

enclosing newspaper articles which described a search of AOC executed by the

FBI, the Federal Department of Health and Human Services, and officials from the

Montana Medicaid Fraud Control Unit.  (*Id.* at 428, 457.)  The news articles

indicated numerous former patients of AOC had contacted federal investigators

with questions and concerns about the treatment they had received.  (*Id.* at 571-75.)

Kalkstein forwarded Day another email from Arguelles's criminal counsel

on June 27, 2017.  (*Id.* at 704-05.)  The email referenced discussions between Dr.

Jon Moses of NorthGauge Health Advisors and radiologist Dr. Michael Staloch.

(*Id.* at 705.)  The email stated Dr. Staloch had significant concerns with the MRI imaging Arguelles used, relaying to Moses that "this appears fraudulent."  (*Id.*)

On August 18, 2017, Kalkstein sent a letter to Day, detailing a meeting he and Arguelles' personal counsel had with Arguelles' criminal lawyers.  (*Id.* at 707-10.)  The letter stated that Arguelles' criminal counsel had advised Arguelles to invoke the Fifth Amendment at any MMLP hearing or civil suit.  (*Id.* at 708.)  The letter noted that one potential sanction if Arguelles did so was a default judgment being entered against him.  (*Id.*)

On October 3, 2018, Fryer filed a lawsuit against Arguelles, alleging medical malpractice.  (*Id.* at 576-86.)  Davison then sued Arguelles on December 24, 2018, also alleging medical malpractice.  (*Id.* at 653-63.)

On December 3, 2018, Day drafted a Reserve Report for the Davison claim. (*Id.* at 805-09.)  The Report contained projected values of $500,000 - $600,000 in past medical specials, $200,000 in future medical specials, and the $250,000 statutory cap on non-economic damages.  (*Id.* 809.)  The Report noted that UMIA did "not have any evidence of the medical specials."  (*Id.*)  The Report recommended setting reserves at $950,000 for Arguelles and $5,000 for AOC. (*Id.*)  Defensibility was rated as "Clear Liability (0-10%)."  (*Id.*)  The Report stated UMIA did not have a standard of care expert, and that it was unable to find expert support in two other cases against Arguelles.  (*Id.* at 808.)  The Report also noted

that Arguelles was under investigation by the DOJ for Medicare fraud, and the investigation was ongoing and active. (*Id.* at 806.)

In March 2019, Michael Eiselein, counsel for Underlying Claimants, served the Fryer and Davison Complaints on Arguelles. (*Id.* at 811-12.) On November 6, 2019, Eiselein sent Arguelles' personal counsel a settlement demand for the Davison claim in the amount of $865,069.59. (*Id.* at 813-42.) He subsequently sent a settlement demand for the Fryer claim in the amount of $856,041 on December 15, 2019. (*Id.* at 843-47.)

On January 8, 2020, Day drafted updated Reserve Reports for the Fryer, Davison and Smith claims. (*Id.* at 858-89.) The Reports requested the Fryer reserve be set at $700,000, the Davison reserve be set at $750,000, and the Smith reserve at $560,000. (*Id.* at 868, 879, 888.) The Reports identified probable verdict ranges of $850,000 - $1,000,000 for Fryer; $850,548 - $900,548 for Davison; and $520,000 - $600,000 for Smith. (*Id.* at 867, 878, 888.) The Reports also estimated a less than 10% global chance of a successful defense. (*Id.*)

The Fryer and Davison Reports noted that UMIA had issued Reservation of Rights letters to Arguelles based on language in the MMLP Applications that Arguelles may have known the diagnoses were fraudulent. (*Id.* at 859, 870.) The Reports also noted Arguelles was a target of a federal criminal investigation, but that no indictments had been issued. (*Id.* at 859, 870, 881.) The Reports also

8

stated Arguelles had been instructed by his criminal counsel to invoke the Fifth Amendment if he were examined under oath in a medical malpractice case. (*Id.* at 860, 871, 881.)

The January 2020 Reserve Reports included a discussion of the expert opinions UMIA had obtained. Dr. John McCahan, a board-certified rheumatologist, stated that after reviewing Arguelles' care "he was frankly taken back by what he feels was the magnitude and scale of Dr. Arguelles's egregious malpractice and inappropriate, costly and dangerous treatment and the damaging consequences to each of these patients." (*Id.* at 865, 875-76, 885-86.) Dr. Suzanne Shaw, a board-certified radiologist, conducted a blind review of the imaging and commented they were of poor quality, and she saw nothing of interest besides minor degenerative changes. (*Id.* at 865, 876, 886.) When she was told the patients had been diagnosed with rheumatoid arthritis based on the images, "she asked if this was a scam." (*Id.*) The January 2020 Reserve Reports also noted Arguelles made a very poor witness at three MMLP hearings. (*Id.* at 867, 877-78, 888.) Day opined that the difficulties in defending the case may be insurmountable when Arguelles takes the Fifth at deposition. (*Id.*) Day recommended attempting to resolve the claims against Arguelles as soon as possible. (*Id.* at 868, 879, 889.)

In March 2020, a UMIA Large Loss Committee was convened to discuss the claims against Arguelles. (*Id.* at 1024.) The Committee requested that Day obtain

medical bills and liens to support the damages claims before the requested settlement authority would be considered.  (*Id.* at 474, 933-34.)

Day updated the Reserve Reports on June 23, 2020.  (*Id.* at 1098-1133.) The June 2020 Reserve Reports included additional discussion of expert opinions UMIA had received.  Dr. Allen Sawitzke, a board-certified rheumatologist, opined that Arguelles departed from the standard of care required of a board-certified rheumatologist in multiple ways.  (*Id.* at 1105-06, 117-18, 1129-30.)  Dr. Devon Klein, a board-certified radiologist, also did not support the care provided.  (*Id.* at 1106-07, 1118, 1130.)  In the June 2020 Reserve Reports, Day renewed her request for up to $700,000 to resolve the Fryer claim, $900,000 to resolve the Davison claim, and $550,000 for the Smith claim.  (*Id.* at 1109, 1121, 1133.)

On July 6, 2020, Fryer and Davison each filed an Amended Complaint, adding causes of action for fraud and constructive fraud, and seeking punitive damages from Arguelles.  (*Id.* at 1134-59.)  On September 29, 2020, Smith filed a Complaint against Arguelles and AOC.  (*Id.* at 1160-69.)  The Smith Complaint included causes of action for medical negligence, fraud, and constructive fraud, and sought punitive damages.  (*Id.*)

On July 17, 2020, Eiselein provided UMIA with a lien packet regarding Fryer's claim, which identified medical liens totaling $49,535.54.  (*Id.* at 1176-81.) Eiselein provided UMIA a lien packet for Davison on October 7, 2020, which

indicated her medical liens were $0.  (*Id.* at 1193-98.)  Although the parties dispute the significance of the lien amounts, the totals were significantly less than had been allocated by Day for "past medical specials" in setting UMIA's reserves.

On August 21, 2020 Kalkstein sent a letter to Day stating that he had received a call from Arguelles' personal counsel.  (Doc. 163-1 at 547-48.) Kalkstein noted Arguelles was on the phone as well, and Arguelles stated his belief that his care was a departure from the standard of care required of a board-certified rheumatologist.  (*Id.*)  Kalkstein further stated he did not believe the matter was defensible, and all efforts should be made to resolve the matter at mediation.  (*Id.*) At his deposition in this matter in August 2023, however, Arguelles testified he did not make this statement, and he never gave his attorneys the authority to admit liability.  (Doc. 143-1 at 48.)

In January 2021, the Fryer and Davison claims were mediated with Montana State District Judge Michael Moses.  On April 6, 2021, Fryer agreed to settle all claims against Arguelles for $480,000.  (*Id.* at 1244-50.)  Of the $480,000 paid to settle the Fryer lawsuit, UMIA agreed to pay $250,000 and Arguelles agreed to pay $230,000.  (*Id.* at 1248.)  Davison settled her claims against Arguelles on February 26, 2021 for $375,000.  (*Id.* at 1257-60.)  UMIA agreed to pay $250,000 of the settlement, and Arguelles agreed to pay $125,000.  (*Id.* at 54.)

Smith's claim was mediated in September 2021.  Smith settled in exchange

for $725,000, with UMIA paying $500,000 and Arguelles paying $225,000. (*Id.* at

54, 1261-65.)

On July 7, 2021, Arguelles reached a settlement with the federal government

to pay $1,268,646 in exchange for a release of civil claims against him for

violations of the False Claims Act, Civil Monetary Penalties Law, Program Fraud

Civil Remedies Act, and common law theories of payment by mistake, unjust

enrichment, and fraud.  (*Id.* at 1266-73.)

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates the

absence of a genuine issue of material fact and entitlement to judgment as a matter

of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  Material facts are those which may affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a

material fact is genuine if there is sufficient evidence for a reasonable factfinder to

return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or

unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec.*

*Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of

establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

12

323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and . . . by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

## III.  Discussion

### A.  Breach of Contract

Arguelles alleges a breach of contract claim against UMIA for breaching the duty to defend, duty to indemnify, and for failure to accept reasonable settlement offers within policy limits.  The parties have filed cross motions for summary judgment on the breach of contract claim.

The Court's jurisdiction over this action is based on diversity of citizenship. Thus, the Court must apply the substantive law of Montana.  *Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002). Under Montana law, insurers have at least three separate and independent duties under an insurance contract: (1) a duty to defend; (2) a duty to indemnify; and (3) in some circumstances, a duty to settle within policy limits.

### 1.  Duty to Defend

Montana law is well-settled that an insurer's duty to defend its insured arises when an insured sets forth facts which represent a risk covered by the terms of an insurance policy.  *Lindsay Drill. & Cont. v. U.S. Fid. & Guar. Co.* (1984), 208 Mont. 91, 94, 676 P.2d 203, 205; *Graber v. State Farm* (1990), 244 Mont. 265, 270, 797 P.2d 214, 217.  Here, the Court has already determined that UMIA did not breach the duty to defend.  (Doc. 69.)  Therefore, to the extent UMIA's motion for summary judgment relates to the duty to defend, it is denied as moot.

14

### 2.    Duty to Indemnify

The duty to indemnify "arises only if coverage under the policy is actually established." *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 411 (Mont. 2013).  An insurer breaches the duty to indemnify by wrongfully refusing to provide coverage when "(1) the established facts trigger coverage under the terms of the policy, and (2) the extent of the claimant's damages are undisputed or clearly exceed policy limits."  *Id.*  In this context, "established facts" are facts that are "either undisputed or are initially disputed but subsequently determined by the fact finder."  *Id.*  "A breach of contract cannot be ameliorated by the reasonableness of the breaching party's actions."  *Id.* at 412.  Therefore, the insurer may not rely on a "reasonable basis" defense to a breach of contract claim for failure to indemnify.  *Id.*

### a.   Did the Established Facts Trigger Coverage

At the outset, UMIA argues the duty to indemnify was not triggered because the Underlying Actions were settled prior to any discovery, and Arguelles' liability was never proven, stipulated or otherwise established.  Accordingly, UMIA contends Arguelles' liability was disputed, and UMIA's duty to indemnify under the policy was not triggered until Arguelles was legally obligated to pay an amount to the Underlying Claimants to compensate them for injury or damages resulting from his medical care.  In support, UMIA points to Arguelles' deposition

testimony in this action where he continues to maintain that he complied with the standard of care and was not negligent.  (Doc. 143-1 at 20.)  UMIA argues that "Arguelles cannot contend [in this action] liability was 'proven, stipulated or otherwise established' while, at the same time, testifying he did nothing wrong and caused no damages."  (Doc. 142 at 9.)

In response, Arguelles points to conflicting evidence in the record indicating he conceded liability by at least August 2020, when Kalkstein informed UMIA that Arguelles had acknowledged that his care departed from the standard of care required of a board-certified rheumatologist.  (Doc. 163-1 at 547.)  As noted above, however, Arguelles now denies ever admitting liability.  (*Id.* at 47-48.)

Nevertheless, Arguelles also points to UMIA's internal assessments of the Underlying Claims, in which UMIA strongly indicated Arguelles breached the standard of care.  For example, Reserve Reports from January and June 2020 noted that every expert UMIA consulted found Arguelles failed to comply with the standard of care.  (*Id.* at 858-889; 1098-1133.)  The Reserve Reports also noted that Arguelles adamantly defended himself despite "overwhelming evidence that he erred in his diagnosis or judgment."  (*Id.*)

While the Court may view one party's position on liability to be more compelling, that is not the Court's role on a motion for summary judgment. Given the conflicting evidence, it is apparent that there are genuine issues of material fact

16

regarding whether liability had been determined at the time of settlement.
Weighing the evidence and making credibility determinations are functions of the
jury.

Additionally, there are material factual disputes concerning whether the
Underlying Claims were excluded from coverage under the fraud or violation of
law exclusions in the Policies. On the one hand, there is evidence that the DOJ
was investigating Arguelles for suspected healthcare fraud (Doc. 143-1 at 3); the
FBI had searched his office (*Id.* at 428, 571-75); and Arguelles had been advised
by his criminal counsel to invoke the Fifth Amendment if he were required to
testify under oath (*Id.* at 707-08; 860). Additionally, Fryer's MMLP Application
alleged Arguelles's diagnosis "may have been knowingly false and fraudulent" (*Id.*
at 112), and Fryer and Davison listed DOJ health care fraud investigator Karl
Krieger as a potential witness (*Id.* at 113, 254). UMIA also notes that experts who
had reviewed Arguelles's MRI images made comments such as "this appears
fraudulent" and "asked if this was a scam." (*Id.* at 705, 865.) In July 2020, the
Underlying Complaints were also amended to specifically add claims for fraud and
constructive fraud arising from Arguelles's allegedly false diagnoses. (*Id.* at 1142-
43; 1156-57.)

On the other hand, fraud was never actually established. The DOJ never
filed criminal charges against Arguelles. (Doc. 163-1 at 563-64.) Rather,

17

Arguelles reached a civil settlement with the DOJ without an admission of liability. (*Id.* at 566.)  In addition, UMIA did not conduct any investigation into the fraud allegations.  (*Id.* at 4.)  UMIA also reported to its reinsurer in June 2021, after the mediation with Judge Moses, that the "alleged violation of federal law which are currently under investigation are not at the state where coverage is impacted."  (*Id.* at 544.)

In short, there is evidence in the record to support both parties' arguments on this issue.  Thus, there are also disputed issues of fact regarding the application of the fraud and violation of law exclusions.

### b.  Were the Claimant's Damages Undisputed?

There are also material factual disputes regarding the extent of the Underlying Claimants' damages.  UMIA argues the Underlying Claimants' damages were not undisputed and did not clearly exceed policy limits.  UMIA asserts the Underlying Claimants never provided sufficient documentation to establish their damages or prove that the claimed damages were caused by Arguelles.  For example, UMIA notes Fryer did not provide medical bills to support her demand of $856,041, which included the cost of unnecessary Remicade treatment, or documentation of her "out of pocket expenses" and travel expenses.  (Doc. 143-1 at 843-47.)  When some documentation was ultimately

18

provided, UMIA notes Fryer's medical liens totaled only $49,535.54.  (*Id.* at 1176-81.)

Similarly, UMIA asserts Davison's demand of $865,069.59 provided no documentation of the claimed Remicade costs and other damages.  UMIA points out, for example, that Davison claimed 11 years of lost wages, but only provided a single year's W-2 to support her claim.  Additionally, after reserves had been established, it was disclosed that Davison's medical liens were $0.  (*Id.* at 813-42; 1193-98.)

Arguelles, on the other hand, points to the Reserve Reports that contain UMIA's internal assessment of causation and damages based on its review hundreds of pages of medical chronologies, records reviews, and expert opinions. (*Id.* at 1098-1133.)  Arguelles notes UMIA's own analysis estimated the special economic damages at more than $500,000 for each claimant.  (*Id.* at 1108 ($700,000 economic damages for Fryer); 1119 ($600,548-650,548 economic damages for Davison); 1131 ($520,000-550,000 economic damages for Smith).)

UMIA responds that the figures in the Reserve Reports were never authorized, and only constituted projected damages that had not been verified. UMIA points out, for example, that the Large Loss Committee requested that Day obtain bills and liens to support the actual damages claimed.

Again, there is evidence in the record to support both parties' arguments. The Court finds the conflicting damages and causation evidence presents a jury question.

### 3.    Duty to Effectuate Settlement[8]

Implicit in every insurance contract is the "duty of 'good faith' consideration of settlement offers." *Freyer*, 312 P.3d at 418 (citing *Jessen v. O'Daniel*, 210 F. Supp. 317 (D. Mont. Nov. 6, 1962)); *Draggin' Y Cattle Co., Inc. v. Jumermier, Clark, Campanella, Stevens, P.C.*, 439 P.3d 935, 943 (Mont. 2019) ("Every insurance contract includes a covenant of good faith and fair dealing, which we have long recognized gives rise to a duty to accept a reasonable offer within policy coverage limits.").  Whether an insurer acted in good faith is determined on a case-by-case basis.  *Id.*

Unlike the duty to indemnify, an insurer may rely on the "reasonable basis in law or fact" defense in response to a claim for breach of the duty to settle.  *Freyer*,

---

[8] The parties take different views of whether the alleged breach of the duty to settle constitutes a breach of contract claim or a breach of the common law duty of good faith and fair dealing. Historically "contractual and tortious breach of the implied covenant of good faith were, at the election of the insured, distinct common-law remedies available for breach of the implied contract duty to settle within policy limits." *Draggin' Y*, 439 P.3d at 950 (Sandefur, J. concurring).  In 1986, Mont. Code Ann. § 33-18-242 was enacted, which effectively abolished first-party tortious bad faith claims and replaced them with a statutory bad faith claim.  *Id.*  But Section 33-18-242 "expressly preserved the continued viability of common-law claims for 'breach of the insurance contract. . . .'" *Id.*  As a result, "a first-party common-law contract claim for breach of the implied covenant of good faith, including breach of the implied duty to settle within policy limits, is a species of claim for 'breach of the insurance contract' preserved inviolate independent of the UTPA regardless of the availability of a similar statutory bad faith remedy under § 33-18-242, MCA." *Id.*

20

312 P.3d at 418; *Draggin' Y*, 439 P.3 at 944.  Thus, an insurer is not liable "for failing to settle within policy limits when it had a reasonable basis in law or fact for contesting coverage." *Freyer*, 312 P.3d at 418.

As is more fully discussed below, the question of whether UMIA acted reasonably in not accepting the Underlying Claimants' offer within policy limits is a question of fact for the jury.  Accordingly, the Court finds summary judgment is not appropriate for either party on Arguelles' breach of contract claims based on the duty to settle.

### B.    Violation of the Unfair Trade Practices Act

 Arguelles alleges UMIA engaged in conduct that violated the UTPA. UMIA argues it is entitled to summary judgment on Arguelles's UTPA claim because it had a reasonable basis to deny coverage and no duty to settle due to a potential coverage exclusion.  Arguelles argues UMIA has not established a reasonable basis defense.

The UTPA regulates an insurer's relations with an insured and prohibits certain claim settlement practices.  Mont. Code Ann. § 33-18-201.  Under the UTPA, an insurer may not "neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear."  Mont. Code Ann. § 33-18-201(6).  But an insurer may not be liable under the UTPA "if the insurer had a reasonable basis in law or in fact for contesting the

21

claim or the amount of the claim, whichever is at issue." Mont. Code Ann. § 33-18-242(5). It is the insurer's burden to establish its reasonable basis defense by a preponderance of the evidence. *Id.* at 937. If an insurer shows a reasonable basis for contesting coverage, it cannot be said to have acted in bad faith. *Freyer*, 312 P.3d at 418.

In *Dean v. Austin Mut. Ins. Co.*, the Montana Supreme Court held, as a general rule, the issue of whether an insurer has a reasonable basis in law or fact for contesting a claim is a question for the trier of fact because "reasonableness is generally a question of fact." *Dean*, 869 P.2d 256, 258 (Mont. 1994). In *Redies v. Attorneys Liab. Prot. Soc'y*, however, the Montana Supreme Court recognized two exceptions to this general rule. *Redies*, 150 P.3d 930, 938 (Mont. 2007). First, "when there [is] no insurance policy in effect at the time the injury occurred," and second, "in a summary judgment proceeding where the underlying 'basis *in law*' [for contesting the claim or the amount of the claim] is grounded on a legal conclusion, and no issues of fact remain in dispute." *Id.* (emphasis and alterations in original). Thus, reasonableness is a question of law for the court to determine only "when it depends *entirely* on interpreting relevant legal precedents and evaluating the insurer's proffered defense under those precedents." *Id.* (emphasis added).

In *Freyer*, for example, the insurer contested coverage based on its interpretation of the "Each Person" limit in the policy. 312 P.3d at 419. In determining the reasonableness of the defense, the Montana Supreme Court examined the "legal landscape" addressing the issue. *Id.* Based on Montana precedent, and that of numerous other jurisdictions, the Court ultimately determined that while the insurer's interpretation was incorrect, it was not unreasonable. *Id.* at 421. The Court, thus, affirmed the district court's grant of summary judgment to the insurer on common-law bad faith, breach of the covenant of good faith and fair dealing, and UTPA claims. *Id.* at 417, 421, 423.

The Court cautioned, however, that "[f]actual disputes affecting coverage are certainly decided by the trier of fact, and [the *Freyer*] opinion does not change that." *Id.* at 422. Therefore, while a court may resolve an insurer's reasonable basis in law defense, underlying factual disputes must still be resolved by the trier of fact. *See Palmer by Diacon v. Farmers Ins. Exch.*, 861 P.2d 895, 899, 902-03 (Mont. 1993) (holding whether the insurer had a reasonable basis to deny an underlying claim was a question of fact where there were disputed facts as to how the insured's accident occurred, and thus, whether there was coverage under the policy); *Kephart v. Nat'l Union Fire Ins. Co. of Pittsburgh Pa.*, 2008 WL 11347415, at *5-6 (D. Mont. Feb. 5, 2008) (denying summary judgment and holding whether the insurer had a reasonable basis for contesting the claim was a

23

jury question where there were disputed facts as to whether the insurer acted in good faith).

Here, unlike in *Freyer*, UMIA's reasonable basis defense is not grounded on its interpretation of legal precedent in its coverage determination. Rather, UMIA's reasonable basis defense turns entirely on competing facts concerning coverage and damages, as discussed above. Thus, whether UMIA had a reasonable basis in fact to contest the claim or amount of the claim, is an assessment for the jury.

Accordingly, UMIA's motion for summary judgment on the UTPA claim must be denied.

## C.  Recoupment

Arguelles also argues UMIA improperly disregarded Montana's recoupment process, and instead engaged in an improper self-help approach to avoid paying potentially uncovered claims. Arguelles contends UMIA should have funded the entire amount of the settlements reached with the Underlying Claimants, and then sought reimbursement from Arguelles through subsequent legal action for any alleged uncovered claims. The procedure proposed by Arguelles, however, has never been endorsed by the Montana Supreme Court.

Arguelles cites *Travelers Cas. & Sur. Co. v Ribi Immunochem Research, Inc.*, 108 P.3d 469 (Mont. 2005) and *Horace Mann Ins. Co. v. Hanke*, 312 P.3d 429 (Mont. 2013) in support of his argument. But *Ribi* dealt with an insurer's

24

ability to recoup defense costs after a court's determination that the insurer had no duty to defend.  The case says nothing about funding settlements.

*Hanke* is also factually distinguishable from this case, and did not establish a rule requiring the *Ribi* recoupment procedure to be followed for the settlement of mixed claims.  Rather, *Hanke*, presented a very unique factual scenario where an insurer agreed to advance an insured's share of a settlement because the insured could not immediately afford to pay their obligation under the settlement agreement.  *Hanke*, 312 P.3d at 432.

In *Hanke*, the insurer, Horace Mann, was defending its insureds, the Hankes, in a theft and conversion case under a full reservation of rights.  *Id.*  The Hankes ultimately reached a settlement with the plaintiff in the underlying case for $54,000.  *Id.*  Horace Mann agreed to pay $20,000 of the settlement, while the Hankes agreed to pay the remaining $34,000.  *Id.*  But the Hankes were subsequently unable to obtain a loan to cover their share.  *Id.*  Consequently, Horace Man reached a separate agreement with the Hankes, whereby it agreed to fund the Hankes' $34,000 share, and reserved its rights to recover the additional $34,000 contribution.  *Id.*  The Montana Supreme Court held that because Horace Mann reserved its right to recover the $34,000, the district court properly awarded $34,000 to Horace Mann to reimburse it for its advancement of the Hankes' share of the settlement.

25

In short, the case did not involve an insurer's recovery of its own share of a settlement agreement, and did not endorse or mandate the recoupment procedure advocated by Arguelles.

The other cases Arguelles relies on are from other states. None reference or apply Montana law and are not, in any way, controlling in this case. Accordingly, to the extent Arguelles' motion for summary judgment is based on application of the *Ribi* recoupment procedure, it is denied.

### D.    Punitive Damages

Arguelles has also brought a claim against UMIA for punitive damages. UMIA argues the punitive damages claim should be dismissed because there is no evidence it acted with actual malice or fraud.

Punitive damages may be awarded in an action brought under the UTPA. Mont. Code Ann. § 33-18-242(5); *Dees v. Am. Nat'l Fire Ins. Co.*, 861 P.2d 141, 149 (Mont. 1993); *Estate of Gleason v. Cent. United Life Ins. Co.*, 350 P.3d 349, 357 (Mont. 2015). "The fact that damages due to a breach of the UTPA may also be damages arising out of a breach of contract should not preclude the award of punitive damages if it can be shown that the insurer acted with malice." *Gleason*, 350 P.3d at 358. To recover punitive damages, the plaintiff must prove by clear and convincing evidence that the insurer acted with "actual fraud or malice." Mont. Code Ann. § 27-1-221.

Under Mont. Code Ann. § 27-1-221(2), a defendant is guilty of actual malice if "the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff."  Mont. Code Ann. § 27-1-221(2.)  The statue further provides that a defendant is guilty of actual fraud "if the defendant: (a) makes a representation with knowledge of its falsity; or (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury."  Mont. Code Ann. § 27-1-221(3).

The plaintiff is not required to prove the statutory elements at the summary judgment stage, but rather that a genuine dispute exists regarding the allegation of actual fraud or malice.  *Wolfe v. BNSF Ry. Co.*, 2017 WL 710405, *3 (D. Mont. Feb. 22, 2017).  "Because of the subjectivity and fact intensive issues involved in proving punitive damages, the determination of whether punitive damages are warranted is typically left to the jury." *Byorth v. USAA Cas. Ins. Co.*, 2020 WL 5232485, *1 (D. Mont. Sept. 2, 2020).  *See also* Mont Code Ann. § 27-1-221(7) ("Liability for punitive damages must be determined by the trier-of-fact, whether judge or jury.").  Thus, summary judgment should be denied if a reasonable juror

27

could determine clear and convincing evidence exists in the record to support a finding of actual fraud or malice. *Byorth*, 2020 WL 5232485 at *1.

"[A]s with proof of the alleged UTPA violation itself, proof of actual malice depends on what the insurer knew or disregarded when it considered the subject claim." *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 206 (Mont. 2008). As discussed above, there are multiple disputed issues of fact in this case regarding whether liability was reasonably clear, the potential applicability of coverage exclusions, and damages. There is also evidence in the record that could support a finding of actual malice. For example, Arguelles has identified evidence that UMIA was aware as early as 2018, that it had no standard of care expert to support Arguelles' care, and that by UMIA's own estimation, there was a less than 10% global chance of a successful defense. Arguelles also cite to internal UMIA records that indicated UMIA estimated the Underlying Claimants' damages to far exceed the amounts UMIA ultimately contributed to settle each of the claims. Accordingly, the Court finds there are questions of fact regarding whether UMIA had knowledge of facts, or intentionally disregarded facts, during the claims process that created a high probability of injury to Arguelles, and should be submitted to the jury.

Accordingly, UMIA is not entitled to summary judgment on Arguelles' claim for punitive damages.

/ / /

**IV.    Conclusion**

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.    Plaintiff UMIA's Motion for Summary Judgment (Doc. 141) is

**DENIED**; and

2.    Defendants Arguelles and AOC's Cross Motion for Summary

Judgment (Doc. 160) is **DENIED**.

        **IT IS ORDERED**.

DATED this 21st day of January, 2025.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge